LLORCA & HAHN LLP
Attorneys for Petitioner
ALLIED CHEMICAL CARRIERS, LLC
8 Watering Lane
Norwalk, CT 06850-4418
(203) 642-7321

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
ALLIED CHEMICAL CARRIERS LLC,                    :
                                                 :
                        Petitioner,              :
                                                 :          08 Civ. 5376 (LTS)
        -against-                                :
                                                 :
NATIONAL BIOFUELS L.L.P.                         :
                                                 :
                        Respondent.              :
-----------------------------------------------------------X

**AFFIDAVIT OF MANUEL R. LLORCA
IN SUPPORT OF PETITIONER'S MOTION
AND APPLICATION TO CONFIRM ARBITRATION AWARDS
AND ENTER JUDGEMENT THEREON**

Manuel R. Llorca, being duly sworn, deposes and says:

1.  I am an attorney admitted to this Court, and a partner in Llorca & Hahn LLP, attorneys
    for Petitioner herein.

2.  On April 30, 2008 two final arbitration awards were issued by unanimous panels of three
    arbitrators in favor of Petitioner and against Respondent.  The Respondent did not appear
    to contest the arbitrations.  The two arbitration panels were appointed pursuant to the
    terms of the arbitration agreements (see Exhibits A, B, C and D hereto) and issued two
    separate arbitration awards, each dated April 30, 2008.  (Exhibit E.)  The underlying facts
    of the disputes are set forth by the arbitrators in each of the awards, along with the
    reasoning behind their decisions.  (Exhibit E.)  Pursuant to the arbitration agreement,

1

Petitioner named Respondent's arbitrators when Respondent failed to do so.  The two arbitrators thus named then picked a Chairman.  (See Exhibits A, B, C and D.)

3.  The Respondent did not pay the awards after service of the awards on it.

4.  The respondent has not moved to vacate or modify the awards within the prescribed time period, and no such application for relief is currently pending.

5.  On June 12, 2008 Petitioner timely filed the within Petition to Confirm Arbitration Awards, and service of the Petition along with this Court's Order dated June 16, 2008 was accomplished on June 25 and June 26, 2008.

6.  Respondent has filed no objection, Answer or other response with respect to the Petition herein.

7.  Pursuant to 9 U.S.C. §13 and to this Court's June 16, 2008 Order, the following are attached to this affidavit in support of this Motion and application to confirm arbitration awards and enter judgement thereon:

Exhibit A:    Underlying charterparty agreements containing arbitration provisions.

Exhibit B:    Petitioner's Arbitration demand.

Exhibit C:    Petitioner's appointment of Respondent's arbitrator pursuant to arbitration agreement.

Exhibit D:    Arbitration Panel's notification to Respondent that the Panel was complete and would proceed.

Exhibit E:    Arbitration awards.

Exhibit F:    Entire Petition "package" served upon Respondent pursuant to this Court's Order of June 16, 2008, including a copy of that Order.

2

8. Despite personal service upon Respondent's CEO and Respondent's Registered Agent, as well as service by mail on the Registered Agent, Respondent has not appeared in nor contested this action to-date.

9. As Respondent has variously done business as "National Biofuels LLP"; "National Biofuels LP"; and "National Biofuels LLC" it is respectfully requested that judgement be entered against those three entities.

_Manuel R. [signature]_

Manuel R. Llorca  (ML 4034)

STATE OF CONNECTICUT      )
COUNTY OF FAIRFIELD       )

Subscribed and sworn to before me this _____ 1 6 _____ day of August, 2008.

> **Leidy Londono**
> Notary Public, Connecticut
> My Commission Expires Aug. 31, 2012

_Leidy London_ [signature]

Notary Public

Commission expires: Aug 31, 2012

3

Exhibit "A"

**Michele Ruscoe**

| | |
|---|---|
| **From:** | Ken Berger |
| **Sent:** | Friday, January 12, 2007 11:16 AM |
| **To:** | Craig Carnahan; Michele Ruscoe |
| **Cc:** | fcc |
| **Subject:** | NATIONAL BIOFUELS / FAIRCHEM COLT FRCP 1/11/07 VOY#23 |

**Attachments:**     NBF



NBF

        Craig - Michiele,

P/c for Fairchem Colt voy #23. Still working on clause 4. MSDS and boilerplate clauses
attached.

Ken

-----Original Message-----
From: Mark Ellenberger [mailto:me@soundtanker.com] On Behalf Of Soundtanker
Sent: Thursday, January 11, 2007 5:31 PM
To: fcc; Ken Berger
Cc: Soundtanker
Subject: FW: Fairchem Colt - NBF - c/p dtd 11-jan-07 - clean recap

Ken,

Pleased to recap the following clean fixture dated today, January 11,
2007

Charterers    : National Biofuels LLP

Owners        : Allied Chemical Carriers LLC as time charter owners

Vessel        : MT Fairchem Colt sub oo
                19, 997MT DWT on 9.715 meters draft SW
                Cubic Capacity 22,186 m3 @98% including slop tanks
                Built 2004 - Panamanian Flag
                LOA 145.50 m - Beam 23.70 m
                Stainless Steel Tanks 316L - Stainless Steel coils

Qty / Cargo : P/C 10-13,000 mt fatty acid methyl ester Load Option : 2% more charterers
option on final declared qty
               Final quantity declarable 12:00 hrs Houston January 15, 2007
Load          : one safe berth Los Angeles/Long Beach
Discharge     : one safe berth Rotterdam
Laycan        : February 1-15, 2007
Laytime       : 300/300 MTPH L/D SHINC-REV
Demurrage     : USD 24,500 PDPR
Freight:      : USD 70.00 PMT basis 13,000 mt
              : USD 75.00 PMT basis 10,000 mt
C/P Form      : Asbatankvoy
Commission    : 2.5% stc + 1.25% address

Rotation/Completion in owner's option
War Risk insurance, if any, for charterer's account General Average/ Arbitration New York
- US Law

01)    CONFIDENTIALITY CLAUSE
All negotiation terms and conditions of this Charter Party shall remain strictly private

1

and confidential.

02)    VESSEL / CARGO TANK SUITABILITY CLAUSE
A)    Vessel to be classed 100 A1 Lloyd's Register (or equivalent) for
all time she will be under this charter party. Any extra insurance and/or governmental
charges on the cargo and/or ship, if any, on account of vessel's age and/or class and/or
flag and/or ownership to be for Owner's account and the amount in question may be deducted
from payment.

B)    Owner warrants that the vessel and its equipment complies with
all mandatory national and international regulations being in force at the date of this
Charter Party applicable to the contracted voyage and cargo, and that the vessel has on
board the necessary valid certificates for this charter party. Owner warrants that the
vessel/Owner is a member of a first class P & I club and will remain so during the
currency of Charter Party.
C)    Owner/vessel to comply with all United States Coast Guard and
OPA regulations, including any such regulations pertaining to alcohol, drugs or drug
testing, vapor return systems and high level alarms systems. Any loss, claim, or action
resulting from Owner's/vessel's noncompliance shall be Owner's responsibility, and any
resulting delay not count as used laytime or demurrage.
D)    Deleted (reference clause 4. Part 1 Section M. Special
Provisions)
E)    Deleted
F)    The cargo is to be loaded into and carried in stainless steel
tank(s) or suitably and sufficiently coated tanks in Owner's option.
Vessel to arrive at load port(s) with all cargo tanks, pumps and pipes suitably clean to
Charterer's inspector's satisfaction and Owner to ensure that all traces of sediment, tank
washings or chemicals, if used, are removed from tanks, pumps and pipes intended for the
carriage of designated cargo.
G)    Any delays or expenses as a result of the vessel arriving at
load port(s) and not being in a suitable condition to load the designated cargo to be for
Owner's account, and such time, expenses not to count against laytime.


03)    PUMPING/TERMINAL CLAUSE
Owner warrants that the vessel is capable of discharging the entire cargo at an
average rate of 100 metric tons per hour or to maintain 100 PSI at the vessel's manifold,
provided the shore facilities permit. Any claim in respect to excess pumping time shall be
accompanied by an hourly manifold pumping log countersigned by both master or other ship
officer and receivers where obtainable, failing which such claim shall be null and void.
Discharge terminal will have the right to gauge pressure, vessel's crew to connect and
disconnect hoses if permitted by local regulations at loading/discharging port at Owner's
risk, time and expense.


04)    INDEPENDENT INSPECTOR CLAUSE
Costs for Charterer's independent inspector to be for Charterer's account, but in
case the vessel is declined by this independent inspector all costs for any further
inspection to be for Owner's account.

05)    NOTICE OF READINESS CLAUSE
Six (6) hours notice of readiness time shall always be granted to Charterer, even if
vessel is already on demurrage. Vessel not to tender notice of readiness nor proceed to
berth prior to 00.01 hours on first lay day without Charterer's permission in writing.


06)    BERTHING CLAUSE (Deleted)

07)    DUES AND WHARFAGE CLAUSE
Owner shall pay dues and other charges upon the vessel, including wharfage, dockage
taxes, even when assessed on the quantity of cargo loaded or discharged. Charterer shall
pay dues and other charges upon the cargo.

08)    SUBLET CLAUSE
Charterer has the right to assign or sublet this charter party or part of it, but in
such case Charterer to remain responsible for right and true fulfillment of same.

2

09)    PARTIAL SHIPMENT CLAUSE
No partial shipments allowed.


11)    ROTATION / COMPLETION / SEGREGATION CLAUSE
       The owner has the right to carry completion cargo for own and/or outside account,
but guarantees to give full and complete segregation to the cargo and to use separate
line(s) and pump(s). Rotation of load and discharge ports in Owner's option but always in
geographical rotation unless otherwise agreed.


12)    TIME BAR CLAUSE
       Charterer shall not be obliged to pay any claim unless such claim, along with
supporting documents (including but not limited to vessel's duly signed time sheets and
terminal logs if obtainable) is received by Charterer or broker within 90 days from
completion of discharge.


13)    SUSPENDED LAYTIME CLAUSE
       In the event of the vessel being delayed in berthing and the vessel has to load
and/or discharge at the berth multiple grades, including cargo/cargoes for the account of
others, any waiting time, if incurred, shall be pro-rated amongst respective charterers
according the amount of cargo to be loaded and/or discharged at said terminal.

In the event the terminal(s) cannot load/discharge all grades simultaneously, any delay
and/or waiting time while loading/discharging cargo/cargoes for other(s), if incurred,
shall not count as used laytime even if the vessel is on demurrage.

If vessel loads/discharges cargo for other charterers at the same berth(s), all waiting
time is to be prorated in accordance with the respective cargo quantities of each
charterer.  Where waiting time, time used and/or time on demurrage results from the act of
a specific charterer, such time shall be attributed to such charterer and shall not count
as used laytime or time on demurrage.


14)    FREIGHT PAYABLE / BILL OF LADINGS CLAUSE
       Freight is payable in U.S. dollars by telegraphic transfer to Owner's nominated
bank. Charterer's option to have original B/L's signed and released in either country of
origin, country of destination or any other country where Owner has a representative.


15)    Y/A AND GENERAL AVERAGE / ARBITRATION CLAUSE
       York/Antwerp rules 1994 to apply. General average/arbitration to be in New York
governed by U.S. law.


16)    NITROGEN CLAUSE delete n/a

17)    HEATING CLAUSE
       If Charterer requires cargo heating, the vessel shall throughout the voyage and the
entire discharge maintain the cargo at the loaded temperature or at the temperature stated
in the Charter Party agreement, whichever is the lower. If requested by the Charterer and
if the length of the voyage allows, the vessel shall increase and maintain the temperature
of the cargo from the loaded temperature to a temperature specified by Charterer.

If the vessel fails to maintain the loaded temperature or to increase and maintain the
temperature of the cargo as requested by Charterer, Charterer shall have the option to
hold vessel off berth and/or to suspend discharging, until the cargo is properly heated.
All time and expense in connection with the foregoing to be for Owner's account.


18)    ETA CLAUSE
       Owners to give 5/3/2/1 days ETA notice to Sound Tanker Chartering, Inc.


3

19)    OVERAGE INSURANCE CLAUSE
       Overage insurance, if any, to be for Owner's account. This applies to any vessel older than 15 years of age.


20)    LETTER OF INDEMNITY CLAUSE
       Should Bills of Lading not arrive discharge port(s), Owner is to discharge and release the entire cargo against a Letter of Indemnity provided by Charterer in accordance with Owner's P and I club wording

21)    BOARD TO BOARD TRANSFER CLAUSE
       Charterer will always have the option to load by ship or by barge and transfer the cargo at a safe anchorage and/or berth at their own risk and expense.

       Always according to OCIMF guidelines and at Master's discretion.


22)    CARGO TRANSFER CLAUSE
       At no time during the voyage shall cargo be transferred between vessel's tanks without the express consent of Charterer. Such consent shall be requested in writing specifying loaded and revised ullages and cargo qualities for the tanks concerned and the reasons necessitating a cargo transfer. Charterer's consent shall not be unreasonably withheld and shall be provided expeditiously in writing. If Charterer grants consent, cargo transfer is to be witnessed by a recognized surveyor with all cost to be for Owner's account. In the event transfer of cargo is unavoidable for emergency reasons involving risk to the vessel or crew, prior consent by charterer shall not be required. However, Owner/master shall inform Charterer of any such circumstances as soon as possible thereafter by in writing.


23)    CAUSTIC PRESENTATION CLAUSE - delete n/a

24)    PROTECTIVE CLAUSES:
       It is understood and agreed that the Chamber of Shipping War Risks Clauses (Tankers) 1952, U.S.A. Clause Paramount, Both to Blame Collision Clause, and New Jason Clause, as attached hereto, are deemed incorporated in this Charter Party.

       BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Bill of Lading falls to be determined in accordance with the laws of the United States of America, the following Clause shall
apply:

If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the matter, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners insofar as such loss or liability represents loss of, or damage to, or any claim whatsoever of the Owners of said goods, paid or payable by the other or non-carrying ship or her Owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or Carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects at fault in respect to a collision or contact.


       NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special

4

charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.


U.S.A. CLAUSE PARAMOUNT

This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1938, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.


CHAMBER OF SHIPPING WAR RISKS CLAUSES (TANKERS) 1952


1. The Master shall not be required or bound to sign Bills of Lading for any blockaded port or for any port which the Master or Owners in his or their discretion consider dangerous or impossible to enter or reach.
2. (A) If any port of loading or of discharge named in this Charter Party or to which the vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or
(B) If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions, or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for vessel to reach any such port of loading or of discharge--the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded and that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owners' discretion dangerous or prohibited).
If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned.  In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated.  In the event, however, that the vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and/or discharging the cargo thereat shall be paid by the Charterers or cargo owners.  In this latter event the Owners shall have a lien on the cargo for all such extra expenses.
3. The vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nation under whose flag the vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations.  If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.
If by reason of or in compliance with any such direction or recommendation the

5

vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo.  Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading.  All extra expenses involved in reaching and discharging the cargo at any such port of discharge shall be paid by the Charterers and/or cargo owners and the Owners shall have a lien on the cargo for freight and all such expenses.

ISPS CLAUSE FOR VOYAGE CHARTER PARTIES
(A)    (i)  It is a condition of this charter party that, from the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel, both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company".
Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The original of the ISSC, or interim ISSC, and the original of the Continuous Synopsis Record (mandatory after 1st July 2004) must be on board the vessel at all times. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay (which shall not count as laytime or, if the vessel is on demurrage, as time on demurrage), excluding consequential loss, caused by failure on the part of the Owners or "the Company" or the Vessel and/or its crew to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(B) (i) Upon the specific request of Owner, the Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and any other available information the Owners reasonably require to comply with the ISPS Code.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers'
account and any delay caused by such failure shall count as laytime or, if the vessel is on demurrage, as time on demurrage.

(C) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code, the following shall
apply:

(i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code shall count as half laytime or half time on demurrage if the Vessel is on demurrage. If the delay occurs before laytime has started or after laytime or time on demurrage has ceased to count as provided for elsewhere within this charter party, it shall nevertheless count as half laytime or, if the vessel is on demurrage, as half time on demurrage, and always in accordance with
A(ii)   and except for any reason directly attributable to the status/circumstances of the Owners and/or Master and/or Crew and/or Vessel.

(iii) Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, unless such costs or

expenses result solely from ᴜne Owners' negligence shall be sᴜ.ared equally between owner and charterer.

(D) All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(E) If either party makes any payment, which is for the other party's account according to this Clause, the other party shall reimburse the paying party all such reasonable and proven expenses.

end recap

brgds,

Mark Ellenberger
Sound Tanker Chartering
(713) 843-7760
(281) 650-4852 c.
soundtanker@soundtanker.com

7

## *SPOT CLAUSES 1 - 24*

**01)   CONFIDENTIALITY CLAUSE**
All negotiation terms and conditions of this Charter Party shall remain strictly private and confidential.

**02)   VESSEL / CARGO TANK SUITABILITY CLAUSE**
   **A)** Vessel to be classed 100 A1 Lloyd's Register (or equivalent) for all time she will be under this charter party. Any extra insurance and/or governmental charges on the cargo and/or ship, if any, on account of vessel's age and/or class and/or flag and/or ownership to be for Owner's account and the amount in question may be deducted from payment.
   **B)** Owner warrants that the vessel and its equipment complies with all mandatory national and international regulations being in force at the date of this Charter Party applicable to the contracted voyage and cargo, and that the vessel has on board the necessary valid certificates for this charter party. Owner warrants that the vessel/Owner is a member of a first class P & I club and will remain so during the currency of Charter Party.
   **C)** Owner/vessel to comply with all United States Coast Guard and OPA regulations, including any such regulations pertaining to alcohol, drugs or drug testing, vapor return systems and high level alarms systems. Any loss, claim, or action resulting from Owner's/vessel's noncompliance shall be Owner's responsibility, and any resulting delay not count as used laytime or demurrage.
   **D)** Deleted (reference clause 4. Part 1 Section M. Special Provisions)
   **E)** Last three cargoes clean/unleaded and suitable for Caustic Soda Solution and Charterers chemical cargoes.
   **F)** The cargo is to be loaded into and carried in stainless steel tank(s) or suitably and sufficiently coated tanks in Owner's option. Vessel to arrive at load port(s) with all cargo tanks, pumps and pipes suitably clean to Charterer's inspector's satisfaction and Owner to ensure that all traces of sediment, tank washings or chemicals, if used, are removed from tanks, pumps and pipes intended for the carriage of designated cargo.
   **G)** Any delays or expenses as a result of the vessel arriving at load port(s) and not being in a suitable condition to load the designated cargo to be for Owner's account, and such time, expenses not to count against laytime.

**03)   PUMPING/TERMINAL CLAUSE**
Owner warrants that the vessel is capable of discharging the entire cargo at a rate of 100 metric tons per hour or to maintain 100 PSI at the vessel's manifold, provided the shore facilities permit. Any claim in respect to excess pumping time shall be accompanied by an hourly manifold pumping log countersigned by both master and receivers where obtainable, failing which such claim shall be null and void. Discharge terminal will have the right to gauge pressure, vessel's crew to connect and disconnect hoses if permitted by local regulations at loading/discharging port at Owner's risk, time and expense.

**04)   INDEPENDENT INSPECTOR CLAUSE**
Costs for Charterer's independent inspector to be for Charterer's account, but in case the vessel is declined by this independent inspector all costs for any further inspection to be for Owner's account. In

case Charterer's inspector rejects the vessel, laytime not to commence until vessel is at berth ready in all respects to load Charterer's cargo, even if vessel is on demurrage.

## 05)   NOTICE OF READINESS CLAUSE

Six (6) hours notice of readiness time shall always be granted to Charterer, even if vessel is already on demurrage. Vessel not to tender notice of readiness nor proceed to berth prior to 00.01 hours on first lay day without Charterer's permission in writing.

## 06)   BERTHING CLAUSE

**A)** Conoco Weather Clause:
Delays in berthing for loading or discharging and any delays after berthing which are due to weather or sea conditions shall count as one half laytime or, if on demurrage, at one half demurrage rate.

**B)** Shifting time from anchorage and/or waiting berth to load or discharge berth not to count as laytime, even if the vessel is on demurrage.

**C)** Notice of readiness should not be tendered between 06:00 hours PM and 06:00 hours AM next day in case there is no night time navigation possible. Time so lost should not count as laytime, even if the vessel is on demurrage.

## 07)   DUES AND WHARFAGE CLAUSE

Owner shall pay dues and other charges upon the vessel, including wharfage, dockage taxes, even when assessed on the quantity of cargo loaded or discharged. Charterer shall pay dues and other charges upon the cargo.

## 08)   SUBLET CLAUSE

Charterer has the right to assign or sublet this charter party or part of it, but in such case Charterer to remain responsible for right and true fulfillment of same.

## 09)   PARTIAL SHIPMENT CLAUSE

No partial shipments allowed.

## 11)   ROTATION / COMPLETION / SEGREGATION CLAUSE

The owner has the right to carry completion cargo for own and/or outside account, but guarantees to give full and complete segregation to the cargo and to use separate line(s) and pump(s). Rotation of load and discharge ports in Owner's option but always in geographical rotation unless otherwise agreed.

## 12)   TIME BAR CLAUSE

Charterer shall not be obliged to pay any claim unless such claim, along with supporting documents (including but not limited to vessel's duly signed time sheets and terminal logs) is received by Charterer within 90 days from completion of discharge.

13) **SUSPENDED LAYTIME CLAUSE**
In the event of the vessel being delayed in berthing and the vessel has to load and/or discharge at the berth multiple grades, including cargo/cargoes for the account of others, any waiting time, if incurred, shall be pro-rated amongst respective charterers according the amount of cargo to be loaded and/or discharged at said terminal.

In the event the terminal(s) cannot load/discharge all grades simultaneously, any delay and/or waiting time while loading/discharging cargo/cargoes for other(s), if incurred, shall not count as used laytime even if the vessel is on demurrage.

If vessel loads/discharges cargo for other charterers at the same berth(s), all waiting time is to be prorated in accordance with the respective cargo quantities of each charterer. Where waiting time, time used and/or time on demurrage results from the act of a specific charterer, such time shall be attributed to such charterer and shall not count as used laytime or time on demurrage.

14) **FREIGHT PAYABLE / BILL OF LADINGS CLAUSE**
Freight is payable in U.S. dollars by telegraphic transfer to Owner's nominated bank. Charterer's option to have original B/L's signed and released in either country of origin, country of destination or any other country where Owner has a representative.

15) **Y/A AND GENERAL AVERAGE / ARBITRATION CLAUSE**
York/Antwerp rules 1994 to apply. General average/arbitration to be in New York governed by U.S. law.

16) **NITROGEN CLAUSE**
It is in Charterer's option to purge and blanket any or all tanks/cargoes requiring nitrogen prior to and upon completion loading their cargo. Owner will maintain cargo under positive pressure with nitrogen throughout the duration of the voyage.

17) **HEATING CLAUSE**
If Charterer requires cargo heating, the vessel shall throughout the voyage and the entire discharge maintain the cargo at the loaded temperature or at the temperature stated in the Charter Party agreement, whichever is the lower. If requested by the Charterer and if the length of the voyage allows, the vessel shall increase and maintain the temperature of the cargo from the loaded temperature to a temperature specified by Charterer.

If the vessel fails to maintain the loaded temperature or to increase and maintain the temperature of the cargo as requested by Charterer, Charterer shall have the option to hold vessel off berth and/or to suspend discharging, until the cargo is properly heated. All time and expense in connection with the foregoing to be for Owner's account.

18) **ETA CLAUSE**
Owners to give 5/3/2/1 days ETA notice to L & R Sound Chartering, Inc.

19) **OVERAGE INSURANCE CLAUSE**
Overage insurance, if any, to be for Owner's account. This applies to any vessel older than 15 years of age.

20) **LETTER OF INDEMNITY CLAUSE**
Should Bills of Lading not arrive discharge port(s), Owner is to discharge and release the entire cargo against a Letter of Indemnity provided by Charterer in accordance with Owner's P and I club wording, no bank guarantee required.

21) **BOARD TO BOARD TRANSFER CLAUSE**
Charterer will always have the option to load by ship or by barge and transfer the cargo at a safe anchorage and/or berth at their own risk and expense.

Always according to OCIMF guidelines and at Master's discretion.

22) **CARGO TRANSFER CLAUSE**
At no time during the voyage shall cargo be transferred between vessel's tanks without the express consent of Charterer. Such consent shall be requested in writing specifying loaded and revised ullages and cargo qualities for the tanks concerned and the reasons necessitating a cargo transfer. Charterer's consent shall not be unreasonably withheld and shall be provided expeditiously in writing. If Charterer grants consent, cargo transfer is to be witnessed by a recognized surveyor with all cost to be for Owner's account. In the event transfer of cargo is unavoidable for emergency reasons involving risk to the vessel or crew, prior consent by charterer shall not be required. However, Owner/master shall inform Charterer of any such circumstances as soon as possible thereafter by in writing.

23) **CAUSTIC PRESENTATION CLAUSE**
Vessel's tanks to be presented ready to load above mentioned caustic soda odor and resin free and with less than 500 ppm hydrocarbons residues. Tank linings (all surfaces, including the roof other non-wetted surfaces) must be 98% intact or better, with no active rust. Any blisters in tank linings must be appropriately addressed to insure that contaminants are not present under the lining. Loose lining, scale and blisters must be removed to prevent them from entering the product from entering the product after loading.

24) **PROTECTIVE CLAUSES:**
It is understood and agreed that the Chamber of Shipping War Risks Clauses (Tankers) 1952, U.S.A. Clause Paramount, Both to Blame Collision Clause, and New Jason Clause, as attached hereto, are deemed incorporated in this Charter Party.

# BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Bill of Lading falls to be determined in accordance with the laws of the United States of America, the following Clause shall apply:

If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the matter, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners insofar as such loss or liability represents loss of, or damage to, or any claim whatsoever of the Owners of said goods, paid or payable by the other or non-carrying ship or her Owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or Carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects at fault in respect to a collision or contact.

# NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers.  Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

# U.S.A. CLAUSE PARAMOUNT

This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1938, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act.  If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

## CHAMBER OF SHIPPING WAR RISKS CLAUSES (TANKERS) 1952

1. The Master shall not be required or bound to sign Bills of Lading for any blockaded port or for any port which the Master or Owners in his or their discretion consider dangerous or impossible to enter or reach.

2. (A) If any port of loading or of discharge named in this Charter Party or to which the vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

(B) If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions, or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for vessel to reach any such port of loading or of discharge--the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owners' discretion dangerous or prohibited). If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and/or discharging the cargo thereat shall be paid by the Charterers or cargo owners. In this latter event the Owners shall have a lien on the cargo for all such extra expenses.

3. The vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nation under whose flag the vessel sails or any other government or local authority including any *de facto* government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such port of discharge shall be paid by the Charterers and/or cargo owners and the Owners shall have a lien on the cargo for freight and all such expenses.

## ISPS CLAUSE FOR VOYAGE CHARTER PARTIES

(A) (i) It is a condition of this charter party that, from the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel, both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The original of the ISSC, or interim ISSC, and the original of the Continuous Synopsis Record (mandatory after 1st July 2004) must be on board the vessel at all times. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay (which shall not count as laytime or, if the vessel is on demurrage, as time on demurrage), excluding consequential loss, caused by failure on the part of the Owners or "the Company" or the Vessel and/or its crew to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(B) (i) Upon the specific request of Owner, the Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and any other available information the Owners reasonably require to comply with the ISPS Code.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account and any delay caused by such failure shall count as laytime or, if the vessel is on demurrage, as time on demurrage.

(C) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code, the following shall apply:

(i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code shall count as half laytime or half time on demurrage if the Vessel is on demurrage. If the delay occurs before laytime has started or after laytime or time on demurrage has ceased to count as provided for elsewhere within this charter party, it shall nevertheless count as half laytime or, if the vessel is on demurrage, as half time on demurrage, and always in accordance with A(ii) and except for any reason directly attributable to the status/circumstances of the Owners and/or Master and/or Crew and/or Vessel.

(iii) Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, unless such costs or expenses result solely from the Owners' negligence shall be shared equally between owner and charterer.

(D) All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(E) If either party makes any payment, which is for the other party's account according to this Clause, the other party shall reimburse the paying party all such reasonable and proven expenses.

# Derek Paruolo

**From:**    Linn Trosclair [ltrosclair@soundtanker.com] on behalf of Soundops [soundops@soundtanker.com]
**Sent:**    Monday, April 02, 2007 5:36 PM
**To:**    Ken Berger; fcc
**Subject:** NBF - Fairchem Steed - Final Cargo Quantity

Good afternoon Ken,

Charterers confirm 9500 mt Biodiesel for MT Fairchem Steed.  Charterers option to
3000 mt increase by opening tomorrow April 3rd at 0900hrs NY.

Best Regards,

Linn Trosclair
Sound Tanker Chartering
1900 West Loop South
Suite 945, Houston, Tx. 77027

Phone : (713) 843-7760
Fax    : (713) 843-7765
Email  : soundtanker@soundtanker.com
YahooID: ltros.hou




**From:** Mark Ellenberger
**Sent:** Wednesday, March 28, 2007 6:35 PM
**To:** 'Ken Berger'; fcc@fairfieldchemical.com
**Cc:** Soundtanker
**Subject:** NBF - Fairchem Steed - clean fixture recap

Ken,

Pleased to recap the following clean fixture dated today, March 28, 2007:

Charterers   : National Biofuels LLP

Owners       : Allied Chemical Carriers LLC as time charter owners

Vessel       : MT Fairchem Steed sub oo
               19, 992MT DWT on 9.665 meters draft SW
               Cubic Capacity 23,547.09 m3 @98% including slop tanks
               Built 2005 - Panamanian Flag
               LOA 145 m - Beam 23.70 m
               Stainless Steel Tanks 316L - Stainless Steel coils

Qty / Cargo  : P/C 8000-11000 mt Biodiesel (fatty acid methyl ester)
Load Option  : 5% more or less in vessel owner's option on final declared qty
               Final quantity declarable March 30, 2007
Load         : one safe berth Los Angeles/Long Beach
Discharge    : one safe berth Amsterdam/Rotterdam/Antwerp
Laycan       : April 8-20, 2007
Laytime      : 300/300 MTPH L/D SHINC-REV
Demurrage    : USD 24,500 PDPR
Freight:     : USD 75.00 PMT basis 11,000 mt


9/17/2007

```
               : USD 81.50 PMT basis 8,000 mt
C/P Form       : Asbatankvoy
Commission : 2.5% stc + 1.25% address
```

Other: Vessel to heat cargo to minimum 32c for discharge and if possible to 49c as per receivers instructions
        Owners option transship at discharge port for owners time/risk/expense. Transhipment tonnage subject to
        charterers approval not to be unreasonably withhel.
        Rotation/Completion in owner's option War Risk insurance, if any, for charterer's account General Average/ Arbitration New York - US Law

01)    CONFIDENTIALITY CLAUSE
All negotiation terms and conditions of this Charter Party shall remain strictly private and confidential.

02)    VESSEL / CARGO TANK SUITABILITY CLAUSE
A)    Vessel to be classed 100 A1 Lloyd's Register (or equivalent) for all time she will be under this charter party. Any extra insurance and/or governmental charges on the cargo and/or ship, if any, on account of vessel's age and/or class and/or flag and/or ownership to be for Owner's account and the amount in question may be deducted from payment.

B)    Owner warrants that the vessel and its equipment complies with all mandatory national and international regulations being in force at the date of this Charter Party applicable to the contracted voyage and cargo, and that the vessel has on board the necessary valid certificates for this charter party. Owner warrants that the vessel/Owner is a member of a first class P & I club and will remain so during the currency of Charter Party.
C)    Owner/vessel to comply with all United States Coast Guard and OPA regulations, including any such regulations pertaining to alcohol, drugs or drug testing, vapor return systems and high level alarms systems. Any loss, claim, or action resulting from Owner's/vessel's noncompliance shall be Owner's responsibility, and any resulting delay not count as used laytime or demurrage.
D)    Deleted (reference clause 4. Part 1 Section M. Special Provisions)
E)    Deleted
F)    The cargo is to be loaded into and carried in stainless steel tank(s) or suitably and sufficiently coated tanks in Owner's option.
Vessel to arrive at load port(s) with all cargo tanks, pumps and pipes suitably clean to Charterer's inspector's satisfaction and Owner to ensure that all traces of sediment, tank washings or chemicals, if used, are removed from tanks, pumps and pipes intended for the carriage of designated cargo.
G)    Any delays or expenses as a result of the vessel arriving at load port(s) and not being in a suitable condition to load the designated cargo to be for Owner's account, and such time, expenses not to count against laytime.

03)    PUMPING/TERMINAL CLAUSE
        Owner warrants that the vessel is capable of discharging the entire cargo at an average rate of 100 metric tons per hour or to maintain 100 PSI at the vessel's manifold, provided the shore facilities permit. Any claim in respect to excess pumping time shall be accompanied by an hourly manifold pumping log countersigned by both master or other ship officer and receivers where obtainable, failing which such claim shall be null and void. Discharge terminal will have the right to gauge pressure, vessel's crew to connect and disconnect hoses if permitted by local regulations at loading/discharging port at Owner's risk, time and expense.

04)    INDEPENDENT INSPECTOR CLAUSE (Deleted)

9/17/2007

05)     NOTICE OF READINESS CLAUSE
        Six (6) hours notice of readiness time shall always be granted to Charterer, even if vessel is already on demurrage. Vessel not to tender notice of readiness nor proceed to berth prior to 00.01 hours on first lay day without Charterer's permission in writing.

06)     BERTHING CLAUSE (Deleted)

07)     DUES AND WHARFAGE CLAUSE
        Owner shall pay dues and other charges upon the vessel, including wharfage, dockage taxes, even when assessed on the quantity of cargo loaded or discharged. Charterer shall pay dues and other charges upon the cargo.

08)     SUBLET CLAUSE
        Charterer has the right to assign or sublet this charter party or part of it, but in such case Charterer to remain responsible for right and true fulfillment of same.

09)     PARTIAL SHIPMENT CLAUSE
No partial shipments allowed.

11)     ROTATION / COMPLETION / SEGREGATION CLAUSE
        The owner has the right to carry completion cargo for own and/or outside account, but guarantees to give full and complete segregation to the cargo and to use separate line(s) and pump(s). Rotation of load and discharge ports in Owner's option but always in geographical rotation unless otherwise agreed.

12)     TIME BAR CLAUSE
        Charterer shall not be obliged to pay any claim unless such claim, along with supporting documents (including but not limited to vessel's duly signed time sheets and terminal logs if obtainable) is received by Charterer or broker within 90 days from completion of discharge.

13)     SUSPENDED LAYTIME CLAUSE
        In the event of the vessel being delayed in berthing and the vessel has to load and/or discharge at the berth multiple grades, including cargo/cargoes for the account of others, any waiting time, if incurred, shall be pro-rated amongst respective charterers according the amount of cargo to be loaded and/or discharged at said terminal.

In the event the terminal(s) cannot load/discharge all grades simultaneously, any delay and/or waiting time while loading/discharging cargo/cargoes for other(s), if incurred, shall not count as used laytime even if the vessel is on demurrage.

If vessel loads/discharges cargo for other charterers at the same berth(s), all waiting time is to be prorated in accordance with the respective cargo quantities of each charterer. Where waiting time, time used and/or time on demurrage results from the act of a specific charterer, such time shall be attributed to such charterer and shall not count as used laytime or time on demurrage.

14)     FREIGHT PAYABLE / BILL OF LADINGS CLAUSE
        Freight is payable in U.S. dollars by telegraphic transfer to Owner's nominated bank. Charterer's option to have original B/L's signed and released in either country of origin, country of destination or any other country where Owner

has a representative.


15)    Y/A AND GENERAL AVERAGE / ARBITRATION CLAUSE
       York/Antwerp rules 1994 to apply. General average/arbitration to be in New York governed by U.S. law.


16)    NITROGEN CLAUSE delete n/a

17)    HEATING CLAUSE
       If Charterer requires cargo heating, the vessel shall throughout the voyage and the entire discharge maintain the cargo at the loaded temperature or at the temperature stated in the Charter Party agreement, whichever is the lower. If requested by the Charterer and if the length of the voyage allows, the vessel shall increase and maintain the temperature of the cargo from the loaded temperature to a temperature specified by Charterer.

If the vessel fails to maintain the loaded temperature or to increase and maintain the temperature of the cargo as requested by Charterer, Charterer shall have the option to hold vessel off berth and/or to suspend discharging, until the cargo is properly heated. All time and expense in connection with the foregoing to be for Owner's account.


18)    ETA CLAUSE
       Owners to give 5/3/2/1 days ETA notice to Sound Tanker Chartering, Inc.


19)    OVERAGE INSURANCE CLAUSE
       Overage insurance, if any, to be for Owner's account. This applies to any vessel older than 15 years of age.


20)    LETTER OF INDEMNITY CLAUSE
       Should Bills of Lading not arrive discharge port(s), Owner is to discharge and release the entire cargo against a Letter of Indemnity provided by Charterer in accordance with Owner's P and I club wording

21)    BOARD TO BOARD TRANSFER CLAUSE
       Charterer will always have the option to load by ship or by barge and transfer the cargo at a safe anchorage and/or berth at their own risk and expense.

       Always according to OCIMF guidelines and at Master's discretion.


22)    CARGO TRANSFER CLAUSE
       At no time during the voyage shall cargo be transferred between vessel's tanks without the express consent of Charterer. Such consent shall be requested in writing specifying loaded and revised ullages and cargo qualities for the tanks concerned and the reasons necessitating a cargo transfer. Charterer's consent shall not be unreasonably withheld and shall be provided expeditiously in writing. If Charterer grants consent, cargo transfer is to be witnessed by a recognized surveyor with all cost to be for Owner's account. In the event transfer of cargo is unavoidable for emergency reasons involving risk to the vessel or crew, prior consent by charterer shall not be required. However, Owner/master shall inform Charterer of any such circumstances as soon as possible thereafter by in writing.


9/17/2007

23)    CAUSTIC PRESENTATION CLAUSE - delete n/a

24)    PROTECTIVE CLAUSES:
       It is understood and agreed that the Chamber of Shipping War Risks Clauses
(Tankers) 1952, U.S.A. Clause Paramount, Both to Blame Collision Clause, and New
Jason Clause, as attached hereto, are deemed incorporated in this Charter Party.

       BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing
this Bill of Lading falls to be determined in accordance with the laws of the
United States of America, the following Clause shall
apply:

If the ship comes into collision with another ship as a result of the negligence of
the other ship and any act, neglect or default of the matter, mariner, pilot or the
servants of the Carrier in the navigation or in the management of the ship, the
Owners of the goods carried hereunder will indemnify the Carrier against all loss
or liability to the other or non-carrying ship or her Owners insofar as such loss
or liability represents loss of, or damage to, or any claim whatsoever of the
Owners of said goods, paid or payable by the other or non-carrying ship or her
Owners of said goods and set off, recouped or recovered by the other or non-
carrying ship or her Owners as part of their claim against the carrying ship or
Carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in
charge of any ship or ships or objects other than, or in addition to, the colliding
ships or objects at fault in respect to a collision or contact.


       NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after commencement
of the voyage resulting from any cause whatsoever, whether due to negligence or
not, for which, or for the consequences of which, the carrier is not responsible,
by statute, contract, or otherwise, the goods, shippers, consignees, or owners of
the goods shall contribute with the carrier in general average to the payment of
any sacrifices, losses, or expenses of a general average nature that may be made or
incurred, and shall pay salvage and special charges incurred in respect of the
goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as
fully as if such salving ship or ships belonged to strangers.  Such deposit as the
carrier or his agents may deem sufficient to cover the estimated contribution of
the goods and any salvage and special charges thereon shall, if required, be made
by the goods, shippers, consignees or owners of the goods to the carrier before
delivery.


       U.S.A. CLAUSE PARAMOUNT

This bill of lading shall have effect subject to the provisions of the Carriage of
Goods by Sea Act of the United States, approved April 16, 1938, which shall be
deemed to be incorporated herein, and nothing herein contained shall be deemed a
surrender by the carrier of any of its rights or immunities or an increase of any
of its responsibilities or liabilities under said Act.  If any term of this bill of
lading be repugnant to said Act to any extent, such term shall be void to that
extent, but no further.



9/17/2007

CHAMBER OF SHIPPING WAR RISKS CLAUSES (TANKERS) 1952

    1. The Master shall not be required or bound to sign Bills of Lading for any blockaded port or for any port which the Master or Owners in his or their discretion consider dangerous or impossible to enter or reach.
    2. (A) If any port of loading or of discharge named in this Charter Party or to which the vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or
    (B) If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions, or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for vessel to reach any such port of loading or of discharge--the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owners' discretion dangerous or prohibited).
If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned.  In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated.  In the event, however, that the vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and/or discharging the cargo thereat shall be paid by the Charterers or cargo owners.  In this latter event the Owners shall have a lien on the cargo for all such extra expenses.
    3. The vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nation under whose flag the vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations.  If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.
    If by reason of or in compliance with any such direction or recommendation the vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo.  Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have

been ordered pursuant to the terms of the Bills of Lading.  All extra expenses involved in reaching and discharging the cargo at any such port of discharge shall be paid by the Charterers and/or cargo owners and the Owners shall have a lien on the cargo for freight and all such expenses.


ISPS CLAUSE FOR VOYAGE CHARTER PARTIES
(A)  (i) It is a condition of this charter party that, from the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel, both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company".
Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The original of the ISSC, or interim ISSC, and the original of the Continuous Synopsis Record (mandatory after 1st July 2004) must be on board the vessel at all times. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay (which shall not count as laytime or, if the vessel is on demurrage, as time on demurrage), excluding consequential loss, caused by failure on the part of the Owners or "the Company" or the Vessel and/or its crew to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(B) (i) Upon the specific request of Owner, the Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and any other available information the Owners reasonably require to comply with the ISPS Code.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers'
account and any delay caused by such failure shall count as laytime or, if the vessel is on demurrage, as time on demurrage.

(C) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code, the following shall apply:

(i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code shall count as half laytime or half time on demurrage if the Vessel is on demurrage. If the delay occurs before laytime has started or after laytime or time on demurrage has ceased to count as provided for elsewhere within this charter party, it shall nevertheless count as half laytime or, if the vessel is on demurrage, as half time on demurrage, and always in accordance with
A(ii)  and except for any reason directly attributable to the status/circumstances of the Owners and/or Master and/or Crew and/or Vessel.

(iii) Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant

9/17/2007

authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, unless such costs or expenses result solely from the Owners' negligence shall be shared equally between owner and charterer.

(D) All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(E) If either party makes any payment, which is for the other party's account according to this Clause, the other party shall reimburse the paying party all such reasonable and proven expenses.

end recap

Ken, thank you for your continued support leading to this fixture.

Best Regards,

Mark Ellenberger
Sound Tanker Chartering
1900 West Loop South
Suite 945, Houston, Tx. 77027

Phone : (713) 843-7760
Fax   : (713) 843-7765
Email  : soundtanker@soundtanker.com
YahooID: ltros.hou

9/17/2007

Association of Ship Brokers
& Agents (U.S.A.), Inc.

October 1977

CODE WORD FOR THIS
CHARTER PARTY:

ASBATANKVOY

# TANKER VOYAGE CHARTER PARTY

## PREAMBLE

_____    _____
Place                                          Date

IT IS THIS DAY AGREED between _____

chartered owner/owner (hereinafter called the "Owner") of the _____

SS/MS _____ (hereinafter called the "Vessel")

and _____ (hereinafter called the "Charterer")

that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble

and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

### PART I

A.    Description and Position of Vessel:

Deadweight:              tons (2240 lbs.)        Classed:

Loaded draft of Vessel on assigned summer freeboard        ft.      in. in salt water.

Capacity for cargo:            tons (of 2240 lbs. each)      % more or less, Vessel's option.

Coated:      ☐ Yes        ☐ No

Coiled:       ☐ Yes        ☐ No            Last two cargoes:

Now:                            Expected Ready:

B.    Laydays:

Commencing:                  Cancelling:

C.    Loading Port(s)

Charterer's Option

D.    Discharging Port(s):

Charterer's Option

E.    Cargo:

Charterer's Option

F.    Freight Rate:                       per ton (of 2240 lbs. each).

G.    Freight Payable to:                          at

H.    Total Laytime in Running Hours:

G.  Freight Payable to:

H.  Total Laytime in Running Hours:

I.  Demurrage per day:

J.  Commission of        % is payable by Owner to

    on the actual amount freight, when and as freight is paid.

K.  The place of General Average and arbitration proceedings to be London/New York (strike out one).

L.  Tovalop: Owner warrants vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter.

M.  Special Provisions:

    IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate as of the day and year first above written.

Witness the signature of: _____

                                By: _____

Witness the Signature of: _____

                                By: _____

# PART II

1. WARRANTY—VOYAGE—CARGO. The vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat) from the factors of the Charterers a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested.

2. FREIGHT. Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3. DEADFREIGHT. Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4. NAMING LOADING AND DISCHARGE PORTS.
(a) The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

| Place | On a voyage to a port or ports in: |
|---|---|
| ST. KITTS | Caribbean or U.S. Gulf (loading port/s) |
| PORT SAID | Eastern Mediterranean or Persian Gulf loading port/s (from ports west of Port Said.) |

(b) If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

| Place | On a voyage to a port or ports in: |
|---|---|
| LAND'S END | United Kingdom/Continent (Bordeaux/Hamburg range) or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTAR | Mediterranean (from Western Hemisphere) |

(c) Any extra expense incurred in connection with any change in loading or discharging port shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used laytime.

5. LAYDAYS. Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

6. NOTICE OF READINESS. Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a seatading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7. HOURS FOR LOADING AND DISCHARGING. The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

8. DEMURRAGE. Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage or delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.

9. SAFE BERTHING—SHIFTING. The Vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lightenage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10. PUMPING IN AND OUT. The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading. Charterer shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into its Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

11. HOSES: MOORING AT SEA TERMINALS. Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12. DUES—TAXES—WHARFAGE. The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto de Comercio Maritimo. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be re-

or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy or marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault or privity of the Owner. And neither the Vessel nor Master or Owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss of damage or delay or failure in performing hereunder, arising or resulting from—Act of God; act of war; perils of the seas; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

20. ISSUANCE AND TERMS OF BILLS OF LADING
(a) The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.
(b) The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Charterer and Owner of the vessel.
(i) CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to the extent but no further.
(ii) JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.
(iii) GENERAL AVERAGE. General Average shall be adjusted, stated and settled according to York/Antwerp Rules 1950 and, as to matters not provided for by those rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared.
(iv) BOTH TO BLAME. If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact.
(v) LIMITATION OF LIABILITY. Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

(c) WAR RISKS. (a) If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or
(b) If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge—the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of this Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited). If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of this Charter Party or not) and such discharge shall be deemed to be due fulfilment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and/or discharging the cargo thereat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.
(c) The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.
If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfilment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such extra expenses.
(viii) DEVIATION CLAUSE. The Vessel shall have liberty to call at any port or ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person

Rehabilitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto de Comercio Maritime. The Charterer shall also pay all taxes on freight or loading or discharging ports and any additional taxes, assessments and/or governmental charges which are not presently in effect but which they may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo, including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13. (a). CARGOES EXCLUDED VAPOR PRESSURE. Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100°F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

(b) FLASH POINT. Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115°F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14. (a). ICE. In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available, the Charterers, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

(b) If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterer, shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per Clause 14 (a) where there is no danger of ice and where there are the necessary facilities for the loading or reception of the cargo in bulk, or to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15. TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

(a) Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

(b) All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

(c) Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

(d) Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16. GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description, the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause I.

17. (a). QUARANTINE. Should Charterer order the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime, but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

(b) FUMIGATION. If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18. CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19. GENERAL EXCEPTIONS CLAUSE. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:—any act, neglect, default

contractor of stevedores and the Owners shall not be entitled to as a discharge has been effected at the port or ports originally designated in which the Vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port or discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses.

(vii) DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

21. LIEN. The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

22. AGENTS. The Owner shall appoint Vessel's agents at all ports.

23. BREACH. Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

24. ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city above-mentioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25. SUBLET. Charterer shall have the right to sublet the Vessel. However, Charterer shall always remain responsible for the fulfillment of this Charter in all its terms and conditions.

26. OIL POLLUTION CLAUSE. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.

Upon notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.

If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterers to arrange. If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.

Should it be determined that the residue is to be co-mingled or segregated on board, the Master shall arrange that the quantity of tank washings be measured in conjunction with cargo suppliers and a note of the quantity measured made in the vessel's ullage record.

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

## BILL OF LADING

Shipped in apparent good order and condition by _____

on board the _____ Steamship _____
Motorship

whereof _____ is Master, at the port of _____

_____

_____

_____

_____

to be delivered at the port of _____

or so near thereto as the Vessel can safely get, always afloat, unto _____

_____

or order on payment of freight at the rate of _____

This shipment is carried under and pursuant to the terms of the charter dated New York/London _____

between _____ and _____ , as
Charterer, and all the terms whatsoever of the said charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

In witness whereof the Master has signed _____ Bills of Lading

of this tenor and date, one of which being accomplished, the others will be void.

Dated at _____ this _____ day of _____

_____
Master

Form 30-165 Printed and Sold by UNACO 700 Central Ave., New Providence, NJ 07974 • (800) 631-3098 • By Authority of the Association of Ship Brokers and Agents USA (ASBA), New York, NY

# Exhibit "B"

THE LAW FIRM OF

# LLORCA & HAHN LLP

40 RICHARDS AVENUE

NORWALK, CONNECTICUT 06854-2319

———

TELEPHONE 203-642-7321

FACSIMILE 203-642-7322

E-MAIL: Admin@LlorcaHahn.com

RICHARD E. HAHN*
MANUEL R. LLORCA+

*ADMITTED IN NEW YORK ONLY
+ADMITTED IN NEW YORK,
 CONNECTICUT & FLORIDA

NEW YORK OFFICE:
444 MADISON AVENUE
27TH FLOOR
NEW YORK, NY 10022-6933
TEL 212-826-8200
FAX 212-935-0671

September 18, 2007

By Facsimile

National Biofuels LLP
5120 Woodway Suite 10010
Houston, TX 77056

Att:   G.P. Manalac
       Chief Executive Officer

Ref:   M/T FAIRCHEM COLT c/p dd Jan 11 2007
       M/T FAIRCHEM STEED c/p dd March 28 2007

Dear Sirs:

Please take notice that our client, Allied Chemical Carriers, LLC. ("ACC"),  hereby demands arbitration pursuant to the charterparties dated January 11, 2007 and March 28, 2007 between ACC and National Biofuels LLP.  Our client is claiming demurrage; extra berth charges; and other expenses invoiced but unpaid  in the total amount of USD 11,975.60 for the January 11, 2007 charter party regarding the FAIRCHEM COLT and USD 94,750.71 for the March 28, 2007 charter party regarding the FAIRCHEM STEED, plus interest, costs and attorneys' fees.

Please take notice that our client names the following arbitrator for each of  the two arbitrations:

          Anthony J. Siciliano
          Sentry Marine Services, Inc.
          PO Box 674
          Smithtown, NY 11787
          Telephone: 631 360 3580
          Fax: 631 360 3560
          Email: ajsmarine@aol.com

THE LAW FIRM OF

LLORCA & HAHN LLP

 

 

Please name your arbitrator (or arbitrators if not the same individual) for each of the two arbitrations within twenty days, or Allied Chemical Carriers, LLC will name your arbitrators for you, as provided by the charterparty arbitration clause. Please confirm that you will agree to consolidate these two arbitrations, to save both parties the additional costs of two separate proceedings.

Very truly yours,

LLORCA & HAHN LLP

Manuel R. Llorca

cc:     Mark Ellenberger
        Sound Tanker Chartering

        Anthony J. Siciliano

        Craig Carnahan

Exhibit  "C"

THE LAW FIRM OF

## LLORCA & HAHN LLP

40 RICHARDS AVENUE

NORWALK, CONNECTICUT 06854-2319

——

TELEPHONE 203-642-7321

FACSIMILE 203-642-7322

E-MAIL: Admin@LlorcaHahn.com

RICHARD E. HAHN*
MANUEL R. LLORCA+

*ADMITTED IN NEW YORK ONLY
+ADMITTED IN NEW YORK,
 CONNECTICUT & FLORIDA

NEW YORK OFFICE:
444 MADISON AVENUE
27TH FLOOR
NEW YORK, NY 10022-6933
TEL 212-826-8200
FAX 212-935-0671

October 10, 2007

By Facsimile
By Mail
By Email

National Biofuels LLP
5120 Woodway Suite 10010
Houston, TX  77056

Att:    G.P. Manalac
        Chief Executive Officer

Att:    Kevin Gorman

Ref:    M/T FAIRCHEM COLT c/p dd Jan 11 2007
        M/T FAIRCHEM STEED c/p dd March 28 2007

Dear Sirs:

    Please take notice that our client, Allied Chemical Carriers, LLC. ("ACC"),  having demanded arbitration pursuant to the charterparties dated January 11, 2007 and March 28, 2007 between ACC and National Biofuels LLP hereby names your arbitrator in those two arbitrations, pursuant to the charterparty terms.  As stated in our client's arbitration demand dated September 18, 2007, our client is claiming demurrage; extra berth charges; and other expenses invoiced but unpaid  in the total amount of USD 11.975.60 for the January 11, 2007 charter party regarding the FAIRCHEM COLT and USD 94,750.71 for the March 28, 2007 charter party regarding the FAIRCHEM STEED, plus interest, costs and attorneys' fees.

THE LAW FIRM OF

# LLORCA & HAHN LLP

Please take notice that, pursuant to the terms of the charterparty arbitration clauses, our client names the following arbitrator as the arbitrator for National Biofuels LLP for each of the two arbitrations:

> Austin L. Dooley, PhD
> 76 Earley Street
> City Island, NY 10464
> Telephone: 718 885 0962
> Fax: 718 885 0964
> Email: DSeawx@IX.netcom.com

Once again, please confirm that you will agree to consolidate these two arbitrations, to save both parties the additional costs of two separate proceedings.

Very truly yours,

LLORCA & HAHN LLP

Manuel R. Llorca

cc:  Mark Ellenberger
     Sound Tanker Chartering
     By email

     Anthony J. Siciliano
     By facsimile

     Austin L. Dooley
     By facsimile

     Craig Carnahan
     Fairfield Chemical Carriers, Inc.
     By email

Exhibit  "D"

# DOOLEY SEAWEATHER ANALYSIS, INC.

P.O. Box 63, City Island, NY 10464
Tel: 718 885 0962 ▪ Fax: 718 885 0964
E-mail: dseawx@ix.netcom.com

October 12, 2007

Mr. Gerard T. Desmond        Via E-mail: gdd917@aol.com
40 Burritt Avenue
Norwalk, CT 06854

**RE: M/T FAIRCHEM COLT c/p dd January 11, 2007**
**M/T FAIRCHEM STEED c/p dd March 28, 2007**

Dear Mr. Desmond:

Mr. Siciliano and I thank you for agreeing to serve as third arbitrator and chairman for procedural matters on the referenced charter party arbitration panels.

As mentioned, the disputes are between Allied Chemical Carriers, LLC, represented by Mr. Llorca, and National Biofuels LLP, whose CEO is Mr. Manalac. The disputes concern demurrage, extra berth charges, other expenses invoiced plus interest, costs and attorneys' fees.

By copy of this letter, I am advising the parties that the panel is now fully constituted and stands ready to proceed.

Very truly yours,

Austin L. Dooley, Ph.D.

cc:
A. J. Siciliano
Sentry Marine Services, Inc.          Fax: (631) 360-3560
P.O. Box 674,                          E-mail: ajsmarine@aol.com
Smithtown, NY 11787

Manuel R. Llorca, Esq.
Law Offices of Llorca & Hahn LLP       Fax: 203-642-7322
40 Richards Avenue                     E-mail: Admin@LlorcaHahn.com
Norwalk, CT 06854

G. P. Manalac
Chief Executive Officer                Fax: 713-993-0096
Attn: Kevin Gorman
National Biofuels LLP
5120 Woodway Suite 10010
Houston, TX 77056

Exhibit  "E"

*Gerard T. Desmond*      *40 Burritt Ave*      *Norwalk, Ct. 06854*
*Phone: 203 838 3512  Cell  203 856 0061   Office 203 761 4603*

June 1, 2008

Manuel R. Llorca, Esq.
Llorca & Hahn LLP
40 Richards Avenue
Norwalk, Ct. 06854

G.P. Manalac
Chief Executive Officer
Attn: Kevin Gorman
National Biofuels LLP
5120 Woodway Suite 10010
Houston, Tx 77056

A.J. Siciliano
Sentry Marine Services, Inc.
P.O. Box 674
Smithtown, N.Y. 11787

Austin L. Dooley, Ph.D.
Dooley Sea Weather Analysis, Inc.
P.O. Box 63
City Island, N.Y. 10464

          Re:    M/T FAIRCHEM COLT c/p January 11, 2007
                 M/T FAIRCHEM STEED c/p March 28, 2007

We are pleased to submit the final Arbitration Award dated April 30, 2008 concerning the disputes on the above referenced Charter parties.

Very truly yours,

Gerard T. Desmond

*Gerard T. Desmond        40 Burritt Ave      Norwalk, Ct. 06854*
*Phone: 203 838 3512  Cell  203 856 0061   Office 203 761 4603*


Cc      Society of Maritime Arbitrators
        30 Broad Street
        7th Floor
        New York, N.Y. 10004
        Attention: Sally Sielski

**In the Matter of the Arbitration**

between

Allied Chemical Carriers LLC
Claimant and Disponent Owner of the
**M/T FAIRCHEM COLT**

- and -

National Biofuels LLP
Respondent and Charterer

Under an ASBATANKVOY Form of
Tanker Voyage Charter Party
dated January 11, 2007

**Decision and Final Award**
**April 30, 2008**

Before:
Austin L. Dooley, Ph.D.
A. J. Siciliano
Gerard T. Desmond, Chair

Appearances:
For Allied Chemical Carriers LLC
Llorca & Hanh LLP
By: Manuel R. Llorca

For National Biofuels LLP
No Appearance

1

## BACKGROUND

This arbitration dispute arises out of a tanker charter party on the ASBATANKVOY Form dated January 11, 2007, between Allied Chemical Carriers LLC (hereinafter "Owner"), disponent owner of the M/T FAIRCHEM COLT (hereinafter "Vessel") and National Biofuels LLP (hereinafter "Charterer"). The parties' agreement called for the Vessel to lift and carry a part cargo of minimum 10,000 mt/maximum 13,000 mt[1] of fatty acid methyl ester from Los Angeles/Long Beach, California to Rotterdam. The charter fixture was memorialized in a post fixture recap between brokers; no formal charter party was drawn up or signed.

The Vessel timely arrived in Los Angeles and tendered her Notice of Readiness (NOR) on February 11, 2007 at 1906 hours. The Vessel berthed at West Way Terminal (LA-70) on February 12, 2007 at 0715 hours, and commenced loading later that morning at 0920 hours. The loading was completed at 0945 hours on February 13, 2007 and hoses were disconnected 1030 hours on the same day.

The Vessel arrived in Rotterdam and tendered NOR at 2148 hours March 24, 2007 at Berth Buoy 61 Petroleumhaven. The NOR was accepted 0830 hours on March 26, 2007. Discharge into barges began 1218 hours on March 26, 2007, and was completed 0542 hours on March 27, 2007. Hoses to the last cargo barges were disconnected at 0618 hours on the same date.

.

On April 10, 2007, Owner submitted its invoice to Charterer for demurrage at load and discharge for $11,975.60 less 1.25% address commission, leaving a claimed net balance due of $11,825.90.

---

[1]  The documents indicate that although the Master nominated the minimum cargo of 10,000mt, only 3,688.48 mt were actually loaded at Los Angeles. However, Owner calculated allowed laytime as though 10,000 mt had been loaded and presented no claim for deadfreight in this proceeding.

## THE CLAIMS

Owner claims net demurrage of $11,825.90 plus interest, the costs of this arbitration and attorney fees. Charterer has not remitted the claimed amount nor responded to Owner's submissions in this arbitration.

## THE PROCEEDINGS

Owner demanded arbitration under Clause 15 of the fixture note, and appointed A.J. Siciliano. When Charterer failed to respond, Owner then appointed Austin L. Dooley, and the two thus chosen arbitrators then selected Gerard T. Desmond to serve as third arbitrator and panel Chair. No formal hearings were held. Instead, the matter proceeded solely on written submission. Although twice urged by the Chair to do so, Charterer chose not to participate or otherwise respond to the demurrage claimed by Owner. On January 29, 2008, the Chair declared the evidentiary phase of the proceeding closed to further submissions.

## DISCUSSION AND DECISION

Owner's demurrage claim was accompanied by demurrage calculations, time sheets, Notices of Readiness and Statement of Facts for both load and discharge ports, letters of protest for slow loading and discharge delays, hourly pumping logs, and Vessel ullage/sounding and capacity report and empty tank reports.

Except as hereinafter discussed, we agree the documents presented generally support the Owner's demurrage claim. The Charterer was correctly allowed laytime of 66 hours and 40 minutes within which to load and discharge the cargo (reversible laytime). However, we have difficulty with Owner's counting the time during which the Vessel was engaged in discharging "prewash" slops into the AQUA SCALDIS, a designated slop barge. That operation only took place after discharge of the cargo had been completed and hoses to the cargo barge SICHEM MANILA were disconnected. Absent evidence that discharge of the "prewash" slops was mandatory or specially agreed to count, rather than laytime, we view that period as time used to prepare the Vessel for her next cargo. Accordingly, instead of the used laytime of 78 hours and 24 minutes calculated by Owner, we find

3

Charterer only used a total of 75 hours and 38 minutes. After deducting allowed laytime of 66 hours, 40 minutes, we conclude the gross demurrage incurred amounted to 8 hours, 58 minutes at $24,500 per day/pro rata, or $9,153.45, less 1.25% address commission or a net due Owner of $9,039.02.

Owner's submissions demonstrate it complied with the charter party requirement to present its demurrage invoice along with the required documentation within 90 days from completion of discharge. Indeed, not only did Owner timely submit the demurrage claim to Charterer's representative by FedEx on April 10, 2007, but Charterer's representative confirmed the claim was duly passed on to the Charterer on April 12, 2007. Charterer did not respond to that presentation nor to the follow up notice which Owner subsequently sent on August 10, 2007.

The panel concludes that Owner is entitled to the net demurrage of $9,039.02, plus interest of $628.57 equal to 7.25 % per annum (the weighted average rate based upon the Federal Reserve Bank Daily Bank Prime Commercial Loan Rate) from May 15, 2007 through the date of this award. and an allowance of $3,500 towards its legal fees and costs.

## ARBITRATORS' FEES

The panel's total fees and expenses amounting to $3,675.00 are assessed in full against Charterer. The individual arbitrator's fees are set forth in the attached Appendix A, which forms a part of this award. Although those fees are the joint and several obligation of both parties, Owner is to pay the fees in the first instance from the escrow account established for this purpose with the Society of Maritime Arbitrators. Once paid, Owner shall become entitled to a further claim-over against Charterer for the full amount of the arbitrator's fees and expenses which we have included in the award.

4

**In the Matter of the Arbitration**

between

Allied Chemical Carriers LLC
Claimant and Disponent Owner of the
**M/T FAIRCHEM COLT**

- and -

National Biofuels LLP
Respondent and Charterer

Under an ASBATANKVOY Form of
Tanker Voyage Charter Party
dated January 11, 2007

## APPENDIX A

The panel's total fees and expenses totaling $3,675.00 are assessed in full against Charterer. Nevertheless, Owner, in the first instance, is to pay the sums shown due to each individual arbitrator . Payment is to be made from the escrow account established for this purpose with the Society of Maritime Arbitrators. Once paid, Owner shall succeed to a further claim-over against Charterer for the full amount of the arbitrator's fees and expenses, which we have included in the award. The fees and expenses remain the joint and several obligation of both parties.

| | |
|---|---|
| Austin L. Dooley | $1,050.00 |
| A. J. Siciliano | $1,125.00 |
| Gerard T. Desmond | $1,500.00 |

New York, New York
April 30, 2008

6

**THE AWARD**

We hereby direct the Charterer to pay to Owner the sum of $16,842.59 within 30 days of the date of this award, failing which interest shall accrue from the date hereof at the rate of 5.25 % per annum (Federal Reserve Bank Daily Bank Prime Commercial Loan Rate) until such time as the full amount has been made or this award is reduced to judgment. We arrive at this amount as follows:

| | |
|---|---:|
| Demurrage | $9,039.02 |
| Interest | $628.57 |
| Arbitrators' fees | $3,675.00 |
| Allowance for Legal Fees and Costs | $3,500.00 |
| TOTAL DUE OWNER | $16,842.59 |

This Final Award may be enforced by a court of competent jurisdiction.

Austin L. Dooley, Ph.D.

A. J. Siciliano

Gerard T. Desmond, Chair

New York, New York
April 30, 2008

5

In the Matter of the Arbitration

between

Allied Chemical Carriers  LLC
Claimant and Disponent Owner of the
**M/T FAIRCHEM STEED**

- and -

National Biofuels LLP
Respondent and Charterer

Under an ASBATANKVOY Form of
Tanker Voyage Charter Party
dated March 28, 2007

**Decision and Final Award
April 30, 2008**

Before:
Austin L. Dooley, Ph.D.
A. J. Siciliano
Gerard T. Desmond, Chair

Appearances:
For Allied Chemical Carriers LLC
Llorca & Hahn LLP
By: Manuel R. Llorca

For National Biofuels LLC
No Appearance

1

## BACKGROUND

The arbitration disputes arise out of a tanker charter party on an ASBATANKVOY Form dated March 28, 2007 (hereinafter "Charter") between Allied Chemical Carriers, LLC (hereinafter "Owner"), disponent owner of the M/T FAIRCHEM STEED (hereinafter "Vessel") and National Biofuels LLP (hereinafter "Charterer"). The parties' agreement called for the Vessel to lift a part cargo of minimum 8,000 mt/ maximum 11,000 mt (later amended to permit Charterer to load up to 12,500 mt) 5% moloo of fatty methyl ester from Los Angeles/Long Beach to one safe berth Amsterdam/Rotterdam/Antwerp[1]. The charter was memorialized in a post fixture recap between brokers; no formal charter party was drawn up or signed.

The Vessel timely arrived at Los Angeles and presented her Notice of Readiness (NOR) on April 14, 2007 at 1248 hours. The Vessel berthed at West Way Terminal (LA-70) on April 15, 2007 at 0112 hours and commenced loading at 0430 hours the same day. The loading was completed at 1555 hours on April 17, 2007 and hoses were disconnected at 1730 hours the same day.

Shortly after the Vessel departed Los Angeles for Amsterdam, the parties agreed to amend the fixture to include Rotterdam as a second discharge port with discharge to take place at two separate berths. Whatever additional compensation was agreed to call Rotterdam was apparently paid, because Owner has only made claim in this proceeding for the $10,000.00 accepted by Charterer for the two berth discharge.

The Vessel arrived at Amsterdam and presented her Notice of Readiness on May 13, 2007 at 0400 hours. The Vessel berthed at Westway, berth 4 at May 14, 2007 at 2335 hours. The Notice of Readiness was accepted on May 15, 2007 at 0100 hours. Discharging commenced on May 15, 2007 at 0125 hours and was completed at 0718 hours on the same day. Hoses were disconnected at 0800 hours on May 15, 2007.

---

[1] The documents indicate that although the Master nominated the maximum cargo of 13,125 mt, only 11,395.014 mt were actually loaded. However, Owner calculated allowed laytime as though the full 13,125 mt had been loaded and made no claim for deadfreight in this proceeding.

2

The Vessel then proceeded to Rotterdam, where she arrived at 2042 hours on May 18, 2007 and presented her Notice of Readiness. The Notice of Readiness was accepted at 0054 hours on April 19, 2007. The Vessel berthed at Vopak Vlaardingen on May 19, 2007 at 0054 hours. Discharge began at 0318 hours on May 19, 2007 and was completed at 0130 hours on May 20, 2007. The hoses were disconnected at 0230 hours on May 20, 2007.

The Vessel shifted to her second berth in Rotterdam, Koole Pernis, where she berthed at 0442 hours on May 20, 2007. She presented her Notice of Readiness at 0230 hours on the same date. The Vessel commenced discharging on May 20, 2007 at 0630 hours and completed discharge of all parcels at 2040 hours on May 21, 2007.    Hoses were disconnected later that evening at 2130 hours.

On June 6, 2007, Owner submitted its invoice to Charterer for demurrage at load and discharge for $85,823.50 less 1.25% address commission, leaving a claimed net balance due of $84,750.71

Owner had previously submitted its invoice to Charterer for the extra berth in Rotterdam in the amount of $10,000.00.

## THE CLAIMS

Owner claims $84,750.71 for net demurrage and $10,000.00 for the extra berth in Rotterdam plus interest, the cost of this arbitration and attorney fees. Charterer has not remitted the claimed amounts nor responded to Owner's submission in this Arbitration.

## THE PROCEEDINGS

Owner demanded arbitration under Clause 15 of the fixture note, and appointed A.J. Siciliano. When Charterer failed to respond, Owner then appointed Austin L. Dooley, and the two thus chosen arbitrators then selected Gerard T. Desmond to serve as third arbitrator and panel Chair. No formal hearings were held. Instead, the matter proceeded solely on written submission. Although twice urged by the Chair to do so, Charterer

3

chose not to participate in this proceeding or otherwise respond to the claims made by Owner. On January 29, 2008, the Chair declared the evidentiary phase of the proceeding closed to further submissions.

## DISCUSSIONS AND DECISIONS

Owner's demurrage claim was accompanied by laytime calculations, time sheets, Notice of Readiness and Statement of Facts for the load and both discharge ports, letters of protests for slow loading and discharge delays, letter of protest due to short loading, letter of protest for discrepancies between shore and ship figures for the three parcels, hourly pumping logs, and vessel ullage/sounding and capacity report, empty tank reports and dry tank certificates.

Owner's claim for second berth compensation was accompanied by Charterer's acknowledgement of responsibility for payment of the $10,000.

After careful review, we agree that Owner's demurrage and second berth discharge at Rotterdam claims are properly supported.   Charterer has been allowed laytime based upon the Master's cargo nomination of 13,125 mt.

Owner's submission demonstrates it complied with the charter party requirement to present its demurrage invoice along with the required documentation within 90 days from completion of discharge. Indeed not only did Owner timely submit the demurrage claim to Charterer's representative by FedEx on June 6, 2007 but Charterer's representative confirmed the claim was duly passed on to the Charterer that same day.  Additionally, Charterer's representative confirms the Extra Berth Charge invoice was received and sent to Charterer on May 16, 2007. Charterer did not respond to either presentation nor the follow up notices subsequently sent on August 10, 2007.

4

The panel concludes that the Owner is entitled to net demurrage of $84,750.71 plus interest of $4,902.58 equal to 7.0853% per annum (the weighted average rate based upon the Federal Reserve Daily Bank Prime Commercial loan rate) from July 6, 2007 through the date of this award.

Additionally the panel has seen persuasive evidence of Charterer's post fixtue agreement to accept responsibility for the second Rotterdam discharge berth charge of $10,000.00. Accordingly, we find that Owner is entitled to the second berth charge of $10,000.00 plus interest of $695.68 equal to 7.2550% per annum (the weighted average rate based upon the Federal Reserve Daily Bank Prim Commercial loan rate) from May 16, 2007 until the date of this award.

The panel also grants Owner an allowance of $3,500.00 toward its legal fees and costs.

## **ARBITRATORS' FEES**

The panel's total fees and expenses amounting to $3,775.00 are assessed in full against Charterer. The individual arbitrators' fees are set forth in the attached Appendix A, which forms a part of this award. Although those fees are the joint and several obligation of both parties, Owner is to pay the fees in the first instance in part from the escrow account established for this purpose with the Society of Maritime Arbitrators, and the shortfall balances in fresh funds to each of the arbitrators. Once paid, Owner shall become entitled to a further claim-over against Charterer for the full amount of the arbitrator's fees and expenses which we have included in the award.

5

In the Matter of the Arbitration

between

Allied Chemical Carriers, LLC
Claimant and Disponent Owner of the
**M/T FAIRCHEM STEED**

- and -

National Biofuels LLP
Respondent and Charterer

Under an ASBATANKVOY Form of
Tanker Voyage Charter Party
dated March 28, 2007

## **APPENDIX A**

The panel's total fees and expenses totaling $3,775.00 are assessed in full against the Charterer. Nevertheless, Owner, in the first instance, is to pay the sums shown due to each individual arbitrator. Payment is to be made in part from the escrow account established for this purpose with the Society of Maritime Arbitrators and the shortfall balances in fresh funds to each of the balances to each of the arbitrators. Once paid, Owner shall succeed to a further claim-over against Charterer for the full amount of the arbitrator's fees and expenses, which we have included in this award. The fees and expenses remain the joint and several obligation of both parties.

| | |
|---|---|
| Austin L. Dooley, Ph.D. | $ 1,100.00 |
| A.J. Siciliano | $ 1,175.00 |
| Gerard T. Desmond | $ 1,500.00 |

New York
April 30, 2008

7

## THE AWARD

We hereby direct the Charterer to remit to Owner the sum of $107,623.97 within 30 days of the date of this award, failing which interest shall accrue from the date hereof at the rate of 5.25% per annum, (Federal Reserve Bank Daily Bank Prime Commercial Loan Rate) until such time as the full amount has been made or this award is reduced to judgment. We arrive at this amount as follows:

| | | |
|---|---|---|
| Demurrage (Net) | $ | 84,750.71 |
| Interest on Demurrage | $ | 4,902.58 |
| Second berth charge | $ | 10,000.00 |
| Interest on second berth charge | $ | 695.68 |
| Arbitrators' fees | $ | 3,775.00 |
| Allowance for legal fees and costs | $ | 3,500.00 |
| Total | $107,623.97 | |

This Final Award may be enforced by a court of competent jurisdiction.

Austin L. Dooley, Ph.D.

A.J. Siciliano

Gerard T. Desmond, Chair

New York
April 30, 2008

6

Exhibit  "F"

JUDGE SWAIN

JS-44 SDNY
REV. 1/2008

CIVIL COVER SHEET    08 CIV 5376

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

JUN 12 2008

**PLAINTIFFS**

Allied Chemical Carriers LLC

**DEFENDANTS**

National Biofuels L.L.P.

**ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
Manuel R. Llorca, Esq., Llorca & Hahn LLP
8 Watering Lane
Norwalk, CT 06850
203.642.7321

**ATTORNEYS (IF KNOWN)**

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Petition to Confirm Arbitration Award.  28 U.S.C. 1333 and 9 U.S.C. 1 et seq.

Has this or a similar case been previously filed in SDNY at any time? No? ☑ Yes? ☐ Judge Previously Assigned _____

If yes, was this case Vol.☐ Invol. ☐ Dismissed. No☐ Yes ☐ If yes, give date _____ & Case No. _____

*(PLACE AN [x] IN ONE BOX ONLY)*    NATURE OF SUIT

**TORTS**

**ACTIONS UNDER STATUTES**

**CONTRACT**

[ ] 110   INSURANCE
[X] 120   MARINE
[ ] 130   MILLER ACT
[ ] 140   NEGOTIABLE INSTRUMENT
[ ] 150   RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151   MEDICARE ACT
[ ] 152   RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
[ ] 153   RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS
[ ] 160   STOCKHOLDERS SUITS
[ ] 190   OTHER CONTRACT
[ ] 195   CONTRACT PRODUCT LIABILITY
[ ] 196   FRANCHISE

**PERSONAL INJURY**

[ ] 310   AIRPLANE
[ ] 315   AIRPLANE PRODUCT LIABILITY
[ ] 320   ASSAULT, LIBEL & SLANDER
[ ] 330   FEDERAL EMPLOYERS' LIABILITY
[ ] 340   MARINE
[ ] 345   MARINE PRODUCT LIABILITY
[ ] 350   MOTOR VEHICLE
[ ] 355   MOTOR VEHICLE PRODUCT LIABILITY
[ ] 360   OTHER PERSONAL INJURY

**PERSONAL INJURY**

[ ] 362   PERSONAL INJURY - MED MALPRACTICE
[ ] 365   PERSONAL INJURY PRODUCT LIABILITY
[ ] 368   ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**

[ ] 370   OTHER FRAUD
[ ] 371   TRUTH IN LENDING
[ ] 380   OTHER PERSONAL PROPERTY DAMAGE
[ ] 385   PROPERTY DAMAGE PRODUCT LIABILITY

**FORFEITURE/PENALTY**

[ ] 610   AGRICULTURE
[ ] 620   OTHER FOOD & DRUG
[ ] 625   DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 630   LIQUOR LAWS
[ ] 640   RR & TRUCK
[ ] 650   AIRLINE REGS
[ ] 660   OCCUPATIONAL SAFETY/HEALTH
[ ] 690   OTHER

**LABOR**

[ ] 710   FAIR LABOR STANDARDS ACT
[ ] 720   LABOR/MGMT RELATIONS
[ ] 730   LABOR/MGMT REPORTING & DISCLOSURE ACT
[ ] 740   RAILWAY LABOR ACT
[ ] 790   OTHER LABOR LITIGATION
[ ] 791   EMPL RET INC SECURITY ACT

**IMMIGRATION**

[ ] 462   NATURALIZATION APPLICATION
[ ] 463   HABEAS CORPUS- ALIEN DETAINEE
[ ] 465   OTHER IMMIGRATION ACTIONS

**BANKRUPTCY**

[ ] 422   APPEAL 28 USC 158
[ ] 423   WITHDRAWAL 28 USC 157

**PROPERTY RIGHTS**

[ ] 820   COPYRIGHTS
[ ] 830   PATENT
[ ] 840   TRADEMARK

**SOCIAL SECURITY**

[ ] 861   HIA (1395ff)
[ ] 862   BLACK LUNG (923)
[ ] 863   DIWC/DIWW (405(g))
[ ] 864   SSID TITLE XVI
[ ] 865   RSI (405(g))

**FEDERAL TAX SUITS**

[ ] 870   TAXES (U.S. Plaintiff or Defendant)
[ ] 871   IRS-THIRD PARTY 26 USC 7609

**OTHER STATUTES**

[ ] 400   STATE REAPPORTIONMENT
[ ] 410   ANTITRUST
[ ] 430   BANKS & BANKING
[ ] 450   COMMERCE
[ ] 460   DEPORTATION
[ ] 470   RACKETEER INFLU- ENCED & CORRUPT ORGANIZATION ACT (RICO)
[ ] 480   CONSUMER CREDIT
[ ] 490   CABLE/SATELLITE TV
[ ] 810   SELECTIVE SERVICE
[ ] 850   SECURITIES/ COMMODITIES/ EXCHANGE
[ ] 875   CUSTOMER CHALLENGE 12 USC 3410
[ ] 890   OTHER STATUTORY ACTIONS
[ ] 891   AGRICULTURAL ACTS
[ ] 892   ECONOMIC STABILIZATION ACT
[ ] 893   ENVIRONMENTAL MATTERS
[ ] 894   ENERGY ALLOCATION ACT
[ ] 895   FREEDOM OF INFORMATION ACT
[ ] 900   APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE
[ ] 950   CONSTITUTIONALITY OF STATE STATUTES

**ACTIONS UNDER STATUTES**

**CIVIL RIGHTS**

[ ] 441   VOTING
[ ] 442   EMPLOYMENT
[ ] 443   HOUSING/ ACCOMMODATIONS
[ ] 444   WELFARE
[ ] 445   AMERICANS WITH DISABILITIES - EMPLOYMENT
[ ] 446   AMERICANS WITH DISABILITIES -OTHER
[ ] 440   OTHER CIVIL RIGHTS

**REAL PROPERTY**

[ ] 210   LAND CONDEMNATION
[ ] 220   FORECLOSURE
[ ] 230   RENT LEASE & EJECTMENT
[ ] 240   TORTS TO LAND
[ ] 245   TORT PRODUCT LIABILITY
[ ] 290   ALL OTHER REAL PROPERTY

**PRISONER PETITIONS**

[ ] 510   MOTIONS TO VACATE SENTENCE 28 USC 2255
[ ] 530   HABEAS CORPUS
[ ] 535   DEATH PENALTY
[ ] 540   MANDAMUS & OTHER
[ ] 550   CIVIL RIGHTS
[ ] 555   PRISON CONDITION

*Check if demanded in complaint:*

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $_____ OTHER _____

*Check YES only if demanded in complaint*
JURY DEMAND: ☐ YES ☑ NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
IF SO, STATE:

JUDGE _____ DOCKET NUMBER_____

NOTE:  Please submit at the time of filing an explanation of why cases are deemed related.

*(PLACE AN x IN ONE BOX ONLY)*                          **ORIGIN**

☑ 1 Original
Proceeding
☐ 2a. Removed from
State Court

☐ 2b. Removed from
State Court AND
at least one
party is pro se.

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
(Specify District)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate Judge
Judgment

*(PLACE AN x IN ONE BOX ONLY)*          **BASIS OF JURISDICTION**              *IF DIVERSITY, INDICATE*
*CITIZENSHIP BELOW.*

☐ 1 U.S. PLAINTIFF   ☐ 2 U.S. DEFENDANT   ☑ 3 FEDERAL QUESTION   ☐ 4 DIVERSITY    *(28 USC 1322, 1441)*
(U.S. NOT A PARTY)

CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF DEF |  | PTF DEF |  | PTF DEF |
|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1  [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3  [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5  [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2  [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4  [ ] 4 | FOREIGN NATION | [ ] 6  [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

Allied Chemical Carriers LLC
5 River Road, Suite 25
Wilton, CT 06897

Fairfield County

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

National Biofuels L.L.P.
4120 Woodway, Suite 10010
Houston, TX 77056
713 297-4500

National Biofuels L.L.P
c/o Fulcrum Power Services, LLC
4120 Woodway, Suite 10010
Houston, TX 77056
713 297-4500

Harris County

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE
RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:    ☐ WHITE PLAINS    ☑ MANHATTAN
(DO NOT check either box if this a PRISONER PETITION.)

DATE 6/11/2008   SIGNATURE OF ATTORNEY OF RECORD
*Manuel R. Llum*

RECEIPT #

ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
[☑] YES (DATE ADMITTED Mo. _Jan_  Yr. _1978_ )
Attorney Bar Code # 4034

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

J. Michael McMahon, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Allied Chemical Carriers LLC,

                              Petitioner(s),

              -against-

National Biofuels L.L.P.,

                              Respondent(s).

No. 08 Civ. 5376 (LTS)(DFE)

ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  JUN. 1 6 2008

LAURA TAYLOR SWAIN, DISTRICT JUDGE:

A Petition to confirm an arbitration award having been filed with the Court pursuant to 9 U.S.C. § 9, it is
hereby

1.    ORDERED that counsel[1] for Petitioner(s) shall serve a copy of this Order on each Respondent
      within ten (10) calendar days following the date of this order, and that a copy of this Order shall
      also be served with any subsequent process that brings in additional parties, and that proof of such
      service shall be filed with the Court promptly. It is further

2.    ORDERED that Petitioner(s) shall file promptly with the Court proof of service of the subject
      petition. It is further

3.    ORDERED, that in the event Respondent(s) fail(s) to file and serve a timely response to the petition
      and does not consent affirmatively to grant of the relief sought therein, Petitioner shall promptly
      serve on Respondent(s) and file with the Court, with a courtesy copy provided to chambers of the
      undersigned, a written application for confirmation and entry of judgment on the award. Such
      application shall include:

      a.    An affidavit confirming that the petition was timely filed and that the award that is the
            subject of the application has not been vacated or modified and that no application for such
            relief is currently pending; and

      b.    The papers enumerated in 9 U.S.C. § 13.

      Petitioner shall promptly file proof of service of the application. It is further

4.    ORDERED that any response(s) to such application shall be served and filed in accordance with
      Local Civil Rule 6.1(b). It is further

5.    ORDERED that, in the event Respondent serves and files opposition to the petition, or Petitioner

---

[1]        As used in this Order, the term "counsel" shall, in the case of an individual party who is proceeding
pro se, mean such party.

fails to file and serve the application described above, a conference shall be held in the above-captioned matter on **September 12, 2008 at 12:15 p.m.** in Courtroom No. 17C², 500 Pearl Street, New York, New York 10007.  It is further

6.    ORDERED that counsel for the parties confer preliminarily at least ten (10) days prior to the date set forth in paragraph 5 above to discuss the following matters:

     a.    Contested and uncontested legal issues;
     b.    Consensual resolution of all or some of the contested issues;
     c.    Whether each party consents to resolution of this matter by a magistrate judge; and
     d.    Any anticipated further submissions and a proposed timetable therefor.
     e.    Settlement.

    It is further

7.    ORDERED  that counsel shall be prepared to discuss the foregoing at the conference, as well as whether mediation may be helpful in resolving this case.  It is further

8.    ORDERED that counsel attending the conference shall seek settlement authority from their respective clients prior to such conference.  If counsel is not granted such authority, the client must be present in person or available by telephone so that a settlement can be consummated if possible. "Settlement authority," as used herein, includes the power to enter into stipulations and make admissions regarding all matters that the participants may reasonably anticipate discussing at the conference including, but not limited to, the matters enumerated in the preceding paragraphs.

9.    In the event that any party fails to comply with this Order, the Court may impose sanctions or take other action as appropriate.  Such sanctions and action may include assessing costs and attorneys' fees, denying the petition, and/or the imposition of other appropriate penalties.

10.    This case has been designated an electronic case.  Counsel for all parties are required to register as filing users in accordance with the Procedures for Electronic Case Filing promptly upon appearing in the case.

     IT IS SO ORDERED.


Dated: New York, New York
     June 16, 2008

                                 LAURA TAYLOR SWAIN
                                   United States District Judge

---

²    On the day of the conference, check the electronic board in the lobby to be certain of the proper courtroom.

formearcf.wpd    version 11/09/05

LLORCA & HAHN LLP
Attorneys for Petitioner
ALLIED CHEMICAL CARRIERS, LLC
8 Watering Lane
Norwalk, CT 06850-4418
(203) 642-7321

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
ALLIED CHEMICAL CARRIERS LLC,                    :

                          Petitioner,            :

          -against-                              :            (

NATIONAL BIOFUELS L.L.P.                          :

                          Respondent.            :
---------------------------------------------------------X



**FRCP 7.1 STATEMENT**

    Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, ALLIED CHEMICAL

CARRIERS LLC is not a publicly traded company.  Its parent companies and sole shareholders

are Fairfield Chemical Carriers, Inc., which is not publicly traded, and Iino Kaiun Kaisha Ltd.,

which is a Japanese publicly owned company listed on the Tokyo stock exchange.

Dated: Norwalk, Connecticut
          June 11, 2008

                              LLORCA & HAHN LLP
                              Attorneys for Petitioner
                              ALLIED CHEMICAL CARRIERS, LLC

                              By:_____

                                Manuel R. Llorca, Esq. (4034)
                                8 Watering Lane
                                Norwalk, CT 06850-4418
                                203-642-7321

LLORCA & HAHN LLP
Attorneys for Petitioner
ALLIED CHEMICAL CARRIERS, LLC
8 Watering Lane
Norwalk, CT 06850-4418
(203) 642-7321



'08 CIV 5376

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ALLIED CHEMICAL CARRIERS LLC,                    :

                      Petitioner,     :

     -against-                                      :

NATIONAL BIOFUELS L.L.P.                          :

                    Respondent.    :
-------------------------------------------------------------X

(          Civ.          )

**PETITION TO CONFIRM
ARBITRATION AWARD**

       Petitioner, ALLIED CHEMICAL CARRIERS LLC, respectfully states to this Court as follows:

1.     Petitioner, pursuant to the provisions of Section 9 of the United Sates Arbitration Act, 9 U.S.C. §§ 1 *et seq.* (the "Act"), petitions to confirm two arbitration awards, both against Respondent and in favor of Petitioner, relating to disputes arising under maritime contracts.

2.     This Court has jurisdiction over the subject matter respecting this proceeding to confirm the arbitration award as the underlying dispute arises out of an alleged breach of charter party and is an admiralty or maritime claim within the meaning of 28 U.S.C. §1333; venue is proper pursuant to Section 9 of the Act as the award was made in the City of New York, State of New York; and the proceeding is timely as it has been commenced within one year of the issuance of the award as required by Section 9 of the Act.

3.     Petitioner was and is a foreign corporation organized and existing under and by virtue of the laws of the Republic of Liberia.

1

## AS AND FOR PETITIONER'S CAUSE OF ACTION
## AGAINST NATIONAL BIOFUELS L.L.P.

4.      Respondent National Biofuels L.L.P. ("National Biofuels"), also doing business as

National Biofuels L.P., was and is a domestic partnership organized and existing under and by

virtue of the laws of Texas with a place of business at 5120 Woodway, Suite 10010, Houston,

Texas 77056, and a place of business c/o Fulcrum Power Services, LLC /Fulcrum Energy LLC,

5120 Woodway, Suite 10010, Houston, Texas  77056.

5.      Petitioner, as Owner of the FAIRCHEM COLT, entered into a charter party dated

January 11, 2007 with Respondent, National Biofuels as Charterer.   The charter party contained

an arbitration clause providing for "arbitration to be in New York governed by U.S. law."

6.      Petitioner, as Owner of the FAIRCHEM STEED, entered into a subsequent charter party

dated March 28, 2007 with Respondent, National Biofuels as Charterer.   The charter party

contained an arbitration clause providing for "arbitration to be in New York governed by U.S.

law."

7.      Disputes arose due to charterer National Biofuel's nonpayment to Allied Chemical

Carriers LLC of demurrage; extra berth charges; and other expenses invoiced but unpaid  in the

total amount of $11,975.60 for the January 11, 2007 charter party regarding the FAIRCHEM

COLT and $94,750.71 for the March 28, 2007 charter party regarding the FAIRCHEM STEED.

8.      On or about September 18, 2007, Petitioner Allied Chemical Carriers LLC made formal

demands upon Respondent National Biofuels for arbitration under each of the charter parties,

with advice regarding Petitioner's appointment of its arbitrator in each case; a demand that

Respondent appoint its arbitrator in each case; and a request that the two matters be consolidated

into one arbitration.

2

9.     No response was received from Respondent, and on October 10, 2007 an arbitrator was appointed in each case on behalf of National Biofuels by Petitioner, pursuant to the terms of the charter party arbitration clause, with notice and copy to Respondent. On October 12, 2007 the third arbitrator in each case was appointed as chairman by the first two arbitrators, with notice and copy to Respondent. Petitioner's submission on the merits was presented to the Panel on January 4, 2008, with notice and copy to Respondent.

10.    Despite requests by the arbitration Panel to Respondent, no submission was made by Respondent to the Panel, and no funds for costs were deposited by Respondent into the escrow account of the Society of Maritime Arbitrators as requested by the Panel on February 22, 2008. Petitioner placed the $6,000.00 requested by the Panel in the escrow account on February 28, 2008.

11.    On April 30, 2008 after a number of unanswered notices and communications to Respondents, the Panel rendered their Final Arbitration Awards in the two arbitrations, finding that the Petitioner was entitled to a total of $107,623.97, including interest through the date of the award and the full costs of the arbitration and an allowance for attorneys fees in the FAIRCHEM STEED arbitration; and the Panel also found that Respondent should further be liable for ongoing interest at the rate of 5.25% per annum from the date of the award until it was paid. A copy of the award is attached as Exhibit A to this petition. The award was sent to Respondent by the Panel.

12.    On April 30, 2008 the Panel found in the FAIRCHEM COLT arbitration that the Petitioner was entitled to a total of $16,842.59 including interest through the date of the award, and an allowance toward its legal fees and the full costs of the arbitration, up to the date of the award. The Panel also awarded interest at the rate of 5.25% per annum from the date of the

3

award until it is paid. A copy of this award is attached as Exhibit B to this petition. The award was sent to the Respondent by the Panel.

13.    No response was made by Respondent to the Panel's awards, and to-date no payment of any amounts awarded has been received.

14.    Petitioner, having been granted the aforesaid awards against Respondent, seeks confirmation thereof by this Court and entry of judgment thereon as follows:

| | |
|---|---|
| FAIRCHEM STEED Demurrage (Net) | $ 84,750.71 |
| FAIRCHEM STEED Interest on Demurrage | $ 4,902.58 |
| FAIRCHEM STEED Second berth charge | $ 10,000.00 |
| FAIRCHEM STEED Interest on berth charge | $ 695.68 |
| FAIRCHEM STEED Arbitrators' fees | $ 3,775.00 |
| FAIRCHEM STEED Allowance for legal fees and costs | $ 3,500.00 |
| FAIRCHEM STEED  Total | $107,623.97 |
| FAIRCHEM COLT Demurrage | $ 9,039.02 |
| FAIRCHEM COLT Interest | $ 628.57 |
| FAIRCHEM COLT Arbitrators' fees | $ 3,675.00 |
| FAIRCHEM COLT Allowance for legal fees and costs | $ 3,500.00 |
| FAIRCHEM COLT Total | $ 16,842.59 |
| Total Judgment Sought | $124,466.56 |

WHEREFORE, Petitioner respectfully prays that this Court grant the following:

1.    That pursuant to the provisions of Section 9 of the United States Arbitration Act, 9 U.S.C. Section 1 *et seq.*, an order be entered herein confirming the aforesaid awards of the arbitrators, and that it direct therein that judgment be entered in favor of Petitioner against

4

Respondent National Biofuels L.L.P., also doing business as National Biofuels L.P., in the amount of $124,466.56, together with interest as awarded by the arbitrators, at the rate of 5.25% per annum from the date of the award until such time as the full amount has been paid and the judgment satisfied, and

    2.     That petitioner be allowed the costs of this proceeding, together with reasonable attorney's fees, plus interest, and such other relief as the Court deems just and proper.

Dated: Norwalk, Connecticut
      June 11, 2008

                    LLORCA & HAHN LLP
                    Attorneys for Petitioner
                    ALLIED CHEMICAL CARRIERS, LLC

                    By: _____
                        Manuel R. Llorca, Esq. (4034)
                        8 Watering Lane
                        Norwalk, CT 06850-4418
                        203-642-7321

TO:    National Biofuels L.L.P.
        Att: G.P. Manalac, CEO
        c/o Fulcrum Power Services, LLC
        5120 Woodway, Suite 10010
        Houston, TX 77056
        713 297-4500

        National Biofuels L.L.P.
        5120 Woodway, Suite 10010
        Houston, TX 77056
        713 297-4500

**Exhibit A**

In the Matter of the Arbitration

between

Allied Chemical Carriers  LLC
Claimant and Disponent Owner of the
**M/T FAIRCHEM STEED**

- and -

National Biofuels LLP
Respondent and Charterer

Under an ASBATANKVOY Form of
Tanker Voyage Charter Party
dated March 28, 2007

**Decision and Final Award
April 30, 2008**

Before:
Austin L. Dooley, Ph.D.
A. J. Siciliano
Gerard T. Desmond, Chair

Appearances:
For Allied Chemical Carriers LLC
Llorca & Hahn LLP
By: Manuel R. Llorca

For National Biofuels LLC
No Appearance

1

## BACKGROUND

The arbitration disputes arise out of a tanker charter party on an ASBATANKVOY Form dated March 28, 2007 (hereinafter "Charter") between Allied Chemical Carriers, LLC (hereinafter "Owner"), disponent owner of the M/T FAIRCHEM STEED (hereinafter "Vessel") and National Biofuels LLP (hereinafter "Charterer"). The parties' agreement called for the Vessel to lift a part cargo of minimum 8,000 mt/ maximum 11,000 mt (later amended to permit Charterer to load up to 12,500 mt) 5% moloo of fatty methyl ester from Los Angeles/Long Beach to one safe berth Amsterdam/Rotterdam/Antwerp[1]. The charter was memorialized in a post fixture recap between brokers; no formal charter party was drawn up or signed.

The Vessel timely arrived at Los Angeles and presented her Notice of Readiness (NOR) on April 14, 2007 at 1248 hours. The Vessel berthed at West Way Terminal (LA-70) on April 15, 2007 at 0112 hours and commenced loading at 0430 hours the same day. The loading was completed at 1555 hours on April 17, 2007 and hoses were disconnected at 1730 hours the same day.

Shortly after the Vessel departed Los Angeles for Amsterdam, the parties agreed to amend the fixture to include Rotterdam as a second discharge port with discharge to take place at two separate berths. Whatever additional compensation was agreed to call Rotterdam was apparently paid, because Owner has only made claim in this proceeding for the $10,000.00 accepted by Charterer for the two berth discharge.

The Vessel arrived at Amsterdam and presented her Notice of Readiness on May 13, 2007 at 0400 hours. The Vessel berthed at Westway, berth 4 at May 14, 2007 at 2335 hours. The Notice of Readiness was accepted on May 15, 2007 at 0100 hours. Discharging commenced on May 15, 2007 at 0125 hours and was completed at 0718 hours on the same day. Hoses were disconnected at 0800 hours on May 15, 2007.

---

[1] The documents indicate that although the Master nominated the maximum cargo of 13,125 mt, only 11,395.014 mt were actually loaded. However, Owner calculated allowed laytime as though the full 13,125 mt had been loaded and made no claim for deadfreight in this proceeding.

The Vessel then proceeded to Rotterdam, where she arrived at 2042 hours on May 18, 2007 and presented her Notice of Readiness. The Notice of Readiness was accepted at 0054 hours on April 19, 2007. The Vessel berthed at Vopak Vlaardingen on May 19, 2007 at 0054 hours. Discharge began at 0318 hours on May 19, 2007 and was completed at 0130 hours on May 20, 2007. The hoses were disconnected at 0230 hours on May 20, 2007.

The Vessel shifted to her second berth in Rotterdam, Koole Pernis, where she berthed at 0442 hours on May 20, 2007. She presented her Notice of Readiness at 0230 hours on the same date. The Vessel commenced discharging on May 20, 2007 at 0630 hours and completed discharge of all parcels at 2040 hours on May 21, 2007.  Hoses were disconnected later that evening at 2130 hours.

On June 6, 2007, Owner submitted its invoice to Charterer for demurrage at load and discharge for $85,823.50 less 1.25% address commission, leaving a claimed net balance due of $84,750.71

Owner had previously submitted its  invoice to Charterer for the extra berth in Rotterdam in the amount of $10,000.00.

## THE CLAIMS

Owner claims $84,750.71 for net demurrage and $10,000.00 for the extra berth in Rotterdam plus interest, the cost of this arbitration and attorney fees. Charterer has not remitted the claimed amounts nor responded to Owner's submission in this Arbitration.

## THE PROCEEDINGS

Owner demanded arbitration under Clause 15 of the fixture note, and appointed A.J. Siciliano. When Charterer failed to respond, Owner then appointed Austin L. Dooley, and the two thus chosen arbitrators then selected Gerard T. Desmond to serve as third arbitrator and panel Chair. No formal hearings were held. Instead, the matter proceeded solely on written submission. Although twice urged by the Chair to do so, Charterer

3

chose not to participate in this proceeding or otherwise respond to the claims made by Owner. On January 29, 2008, the Chair declared the evidentiary phase of the proceeding closed to further submissions.

## DISCUSSIONS AND DECISIONS

Owner's demurrage claim was accompanied by laytime calculations, time sheets, Notice of Readiness and Statement of Facts for the load and both discharge ports, letters of protests for slow loading and discharge delays, letter of protest due to short loading, letter of protest for discrepancies between shore and ship figures for the three parcels, hourly pumping logs, and vessel ullage/sounding and capacity report, empty tank reports and dry tank certificates.

Owner's claim for second berth compensation was accompanied by Charterer's acknowledgement of responsibility for payment of the $10,000.

After careful review, we agree that Owner's demurrage and second berth discharge at Rotterdam claims are properly supported. Charterer has been allowed laytime based upon the Master's cargo nomination of 13,125 mt.

Owner's submission demonstrates it complied with the charter party requirement to present its demurrage invoice along with the required documentation within 90 days from completion of discharge. Indeed not only did Owner timely submit the demurrage claim to Charterer's representative by FedEx on June 6, 2007 but Charterer's representative confirmed the claim was duly passed on to the Charterer that same day. Additionally, Charterer's representative confirms the Extra Berth Charge invoice was received and sent to Charterer on May 16, 2007. Charterer did not respond to either presentation nor the follow up notices subsequently sent on August 10, 2007.

4

The panel concludes that the Owner is entitled to net demurrage of $84,750.71 plus interest of $4,902.58 equal to 7.0853% per annum (the weighted average rate based upon the Federal Reserve Daily Bank Prime Commercial loan rate) from July 6, 2007 through the date of this award.

Additionally the panel has seen persuasive evidence of Charterer's post fixtue agreement to accept responsibility for the second Rotterdam discharge berth charge of $10,000.00. Accordingly, we find that Owner is entitled to the second berth charge of $10,000.00 plus interest of $695.68 equal to 7.2550% per annum (the weighted average rate based upon the Federal Reserve Daily Bank Prim Commercial loan rate) from May 16, 2007 until the date of this award.

The panel also grants Owner an allowance of $3,500.00 toward its legal fees and costs.

**ARBITRATORS' FEES**

The panel's total fees and expenses amounting to $3,775.00 are assessed in full against Charterer. The individual arbitrators' fees are set forth in the attached Appendix A, which forms a part of this award. Although those fees are the joint and several obligation of both parties, Owner is to pay the fees in the first instance in part from the escrow account established for this purpose with the Society of Maritime Arbitrators, and the shortfall balances in fresh funds to each of the arbitrators. Once paid, Owner shall become entitled to a further claim-over against Charterer for the full amount of the arbitrator's fees and expenses which we have included in the award.

**THE AWARD**

We hereby direct the Charterer to remit to Owner the sum of $107,623.97 within 30 days of the date of this award, failing which interest shall accrue from the date hereof at the rate of 5.25% per annum, (Federal Reserve Bank Daily Bank Prime Commercial Loan Rate) until such time as the full amount has been made or this award is reduced to judgment. We arrive at this amount as follows:

| | |
|---|---|
| Demurrage (Net) | $ 84,750.71 |
| Interest on Demurrage | $ 4,902.58 |
| Second berth charge | $ 10,000.00 |
| Interest on second berth charge | $ 695.68 |
| Arbitrators' fees | $ 3,775.00 |
| Allowance for legal fees and costs | $ 3,500.00 |
| Total | $107,623.97 |

This Final Award may be enforced by a court of competent jurisdiction.

Austin L. Dooley, Ph.D.

A.J. Siciliano

Gerard T. Desmond, Chair

New York
April 30, 2008

6

In the Matter of the Arbitration

between

Allied Chemical Carriers, LLC
Claimant and Disponent Owner of the
**M/T FAIRCHEM STEED**

- and -

National Biofuels LLP
Respondent and Charterer

Under an ASBATANKVOY Form of
Tanker Voyage Charter Party
dated March 28, 2007

## APPENDIX A

The panel's total  fees and expenses totaling $3,775.00 are assessed in full against the Charterer. Nevertheless, Owner, in the first instance, is to pay the sums shown due to each individual arbitrator. Payment is to be made in part from the escrow account established for this purpose with the Society of Maritime Arbitrators and the shortfall balances in fresh funds to each of the balances to each of the arbitrators.  Once paid, Owner shall succeed to a further claim-over against Charterer for the full amount of the arbitrator's fees and expenses, which we have included in this award. The fees and expenses remain the joint and several obligation of both parties.


Austin L. Dooley, Ph.D.              $ 1,100.00

A.J. Siciliano                       $ 1,175.00

Gerard T. Desmond                    $ 1,500.00



New York
April 30, 2008

7

**Exhibit  B**

---

**In the Matter of the Arbitration**

between

Allied Chemical Carriers LLC
Claimant and Disponent Owner of the
**M/T FAIRCHEM COLT**

- and -

National Biofuels LLP
Respondent and Charterer

Under an ASBATANKVOY Form of
Tanker Voyage Charter Party
dated January 11, 2007

---

**Decision and Final Award**
**April 30, 2008**

Before:
Austin L. Dooley, Ph.D.
A. J. Siciliano
Gerard T. Desmond, Chair

Appearances:
For Allied Chemical Carriers LLC
Llorca & Hanh LLP
By: Manuel R. Llorca

For National Biofuels LLP
No Appearance

1

## BACKGROUND

This arbitration dispute arises out of a tanker charter party on the ASBATANKVOY Form dated January 11, 2007,  between Allied Chemical Carriers LLC (hereinafter "Owner"), disponent owner of the M/T FAIRCHEM COLT (hereinafter "Vessel") and National Biofuels LLP (hereinafter "Charterer"). The parties' agreement called for the Vessel to lift and carry a part cargo of minimum 10,000 mt/maximum 13,000 mt[1] of fatty acid methyl ester from Los Angeles/Long Beach, California to Rotterdam.  The charter fixture was memorialized in a post fixture recap between brokers; no formal charter party was drawn up or signed.

The Vessel timely arrived in Los Angeles and tendered her Notice of Readiness (NOR) on February 11, 2007 at 1906 hours. The Vessel berthed at West Way Terminal (LA-70) on February 12, 2007 at 0715 hours, and commenced loading later that morning at 0920 hours. The loading was completed at 0945 hours on February 13, 2007 and hoses were disconnected 1030 hours on the same day.

The Vessel arrived in Rotterdam and tendered NOR at 2148 hours March 24, 2007 at Berth Buoy 61 Petroleumhaven. The NOR was accepted 0830 hours on March 26, 2007. Discharge into barges began 1218 hours on March 26, 2007, and was completed 0542 hours on March 27, 2007.   Hoses to the last cargo barges were disconnected at 0618 hours on the same date.

On April 10, 2007, Owner submitted its invoice to Charterer for demurrage at load and discharge for $11,975.60 less 1.25% address commission, leaving a claimed net balance due of $11,825.90.

---

[1]  The documents indicate that although the Master nominated the minimum cargo of 10,000mt, only 3,688.48 mt were actually loaded at Los Angeles. However, Owner calculated allowed laytime as though 10,000 mt  had been loaded  and presented no claim for deadfreight in this proceeding.

## THE CLAIMS

Owner claims net demurrage of $11,825.90 plus interest, the costs of this arbitration and attorney fees. Charterer has not remitted the claimed amount nor responded to Owner's submissions in this arbitration.

## THE PROCEEDINGS

Owner demanded arbitration under Clause 15 of the fixture note, and appointed A.J. Siciliano. When Charterer failed to respond, Owner then appointed Austin L. Dooley, and the two thus chosen arbitrators then selected Gerard T. Desmond to serve as third arbitrator and panel Chair. No formal hearings were held. Instead, the matter proceeded solely on written submission. Although twice urged by the Chair to do so, Charterer chose not to participate or otherwise respond to the demurrage claimed by Owner. On January 29, 2008, the Chair declared the evidentiary phase of the proceeding closed to further submissions.

## DISCUSSION AND DECISION

Owner's demurrage claim was accompanied by demurrage calculations, time sheets, Notices of Readiness and Statement of Facts for both load and discharge ports, letters of protest for slow loading and discharge delays, hourly pumping logs, and Vessel ullage/sounding and capacity report and empty tank reports.

Except as hereinafter discussed, we agree the documents presented generally support the Owner's demurrage claim. The Charterer was correctly allowed laytime of 66 hours and 40 minutes within which to load and discharge the cargo (reversible laytime). However, we have difficulty with Owner's counting the time during which the Vessel was engaged in discharging "prewash" slops into the AQUA SCALDIS, a designated slop barge. That operation only took place after discharge of the cargo had been completed and hoses to the cargo barge SICHEM MANILA were disconnected. Absent evidence that discharge of the "prewash" slops was mandatory or specially agreed to count, rather than laytime, we view that period as time used to prepare the Vessel for her next cargo. Accordingly, instead of the used laytime of 78 hours and 24 minutes calculated by Owner, we find

3

Charterer only used a total of 75 hours and 38 minutes. After deducting allowed laytime of 66 hours, 40 minutes, we conclude the gross demurrage incurred amounted to 8 hours, 58 minutes at $24,500 per day/pro rata, or $9,153.45, less 1.25% address commission or a net due Owner of $9,039.02.

Owner's submissions demonstrate it complied with the charter party requirement to present its demurrage invoice along with the required documentation within 90 days from completion of discharge. Indeed, not only did Owner timely submit the demurrage claim to Charterer's representative by FedEx on April 10, 2007, but Charterer's representative confirmed the claim was duly passed on to the Charterer on April 12, 2007. Charterer did not respond to that presentation nor to the follow up notice which Owner subsequently sent on August 10, 2007.

The panel concludes that Owner is entitled to the net demurrage of $9,039.02, plus interest of $628.57 equal to 7.25 % per annum (the weighted average rate based upon the Federal Reserve Bank Daily Bank Prime Commercial Loan Rate) from May 15, 2007 through the date of this award. and an allowance of $3,500 towards its legal fees and costs.

## ARBITRATORS' FEES

The panel's total fees and expenses amounting to $3,675.00 are assessed in full against Charterer. The individual arbitrator's fees are set forth in the attached Appendix A, which forms a part of this award. Although those fees are the joint and several obligation of both parties, Owner is to pay the fees in the first instance from the escrow account established for this purpose with the Society of Maritime Arbitrators. Once paid, Owner shall become entitled to a further claim-over against Charterer for the full amount of the arbitrator's fees and expenses which we have included in the award.

4

## THE AWARD

We hereby direct the Charterer to pay to Owner the sum of $16,842.59 within 30 days of the date of this award, failing which interest shall accrue from the date hereof at the rate of 5.25 % per annum (Federal Reserve Bank Daily Bank Prime Commercial Loan Rate) until such time as the full amount has been made or this award is reduced to judgment. We arrive at this amount as follows:

| | |
|---|---|
| Demurrage | $9,039.02 |
| Interest | $628.57 |
| Arbitrators' fees | $3,675.00 |
| Allowance for Legal Fees and Costs | $3,500.00 |
| TOTAL DUE OWNER | $16,842.59 |

This Final Award may be enforced by a court of competent jurisdiction.

Austin L. Dooley, Ph.D.

A. J. Siciliano

Gerard T. Desmond, Chair

New York, New York
April 30, 2008

5

**In the Matter of the Arbitration**

between

Allied Chemical Carriers LLC
Claimant and Disponent Owner of the
**M/T FAIRCHEM COLT**

- and -

National Biofuels LLP
Respondent and Charterer

Under an ASBATANKVOY Form of
Tanker Voyage Charter Party
dated January 11, 2007

## APPENDIX A

The panel's total fees and expenses totaling $3,675.00 are assessed in full against Charterer. Nevertheless, Owner, in the first instance, is to pay the sums shown due to each individual arbitrator . Payment is to be made from the escrow account established for this purpose with the Society of Maritime Arbitrators. Once paid, Owner shall succeed to a further claim-over against Charterer for the full amount of the arbitrator's fees and expenses, which we have included in the award. The fees and expenses remain the joint and several obligation of both parties.

| | |
|---|---|
| Austin L. Dooley | $1,050.00 |
| A. J. Siciliano | $1,125.00 |
| Gerard T. Desmond | $1,500.00 |

New York, New York
April 30, 2008

6